**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SARAH CREWS,**

                                        **Plaintiff,**

          **vs.**                                                     **3:17-cv-00213**
                                                                      **(MAD/DEP)**

**THE CITY OF ITHACA, JOHN R.**
**BARBER,** *Chief of Police*,

                                        **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**OFFICE OF EDWARD E. KOPKO**              **EDWARD E. KOPKO, ESQ.**
308 N. Tioga Street
2nd Floor
Ithaca, New York 14850
Attorney for Plaintiff

**ROEMER WALLENS**                         **EARL T. REDDING, ESQ.**
**GOLD & MINEAUX LLP**
13 Columbia Circle
Albany, New York 12203
Attorney for Defendants

**CITY OF ITHACA**                         **KEVIN M. LEVINE, ESQ.**
Office of the City Attorney
108 East Green Street
Ithaca, New York
Attorney for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

          On February 23, 2017, Plaintiff Sarah Crews filed a complaint (the "Complaint") against

Defendants the City of Ithaca and John R. Barber ("Barber") (collectively, "Defendants") alleging

unlawful workplace discrimination under 42 U.S.C. § 2000e ("Title VII") and New York State

Human Rights Law (Executive Law) § 296 ("NYSHRL"), as well as constitutional violations under 42 U.S.C. § 1983. *See* Dkt. No. 1 at ¶¶ 91-144. On June 22, 2017, Defendants filed a motion to dismiss. *See* Dkt. No. 15. Currently before the Court is Defendants' motion to dismiss. For the following reason, the motion is granted in part and denied in part.

## II. BACKGROUND

Plaintiff Sarah Crews ("Plaintiff" or "Crews") is a police officer employed by Defendant City of Ithaca ("Ithaca"). *See* Dkt. No. 1 at ¶ 1. Plaintiff has worked for the Ithaca Police Department ("IPD") since 2007. *See id.* at ¶ 23. Throughout the course of serving in the IPD, Plaintiff has been openly gay and has never conformed to sex stereotypes. *See id.* at ¶¶ 24-25.

Although some of her coworkers at the IPD have been accepting of her sexual orientation and gender non-conforming appearances, this tolerance is not universal. *See id.* at ¶ 26. For example, when Plaintiff was just starting at the IPD, an officer posted an altered image of the "McLovin driver's license"[1] in the IPD men's locker room that replaced McLovin's face with hers. *See id.* at ¶ 28. Two officers were disciplined as a result of the "McLovin" affair. *See id.* at ¶ 30.

IPD policy requires uniformed police officers to wear a uniform. *See id.* at ¶ 31. Although many officers do not wear a tie with their uniform, Plaintiff regularly wears a tie when on duty. *Id.* at ¶¶ 31-32. While she has been in full uniform, some of her colleagues have commented that she looks like a "bus driver." *Id.* at ¶ 34. Plaintiff also alleges that "IPD officers have used non-verbal cues and behaviors to exclude Plaintiff from her peer group." *Id.* at ¶ 36.

---

[1] "McLovin" was the full name listed on a fake identification possessed by the character Fogell, a highschool student in the 2007 movie *Superbad*. The Complaint describes him as "uncool" and "sex-obsessed." Dkt. No. 1 at ¶ 29.

In 2011, IPD modified its policies for searching, transporting, and supervising prisoners in their custody (collectively the "Search and Jail Policies"). *See id.* at ¶¶ 37-38. The transport procedure provides that

> [w]henever possible, officers of the same gender as the prisoner will transport prisoners. Officers transporting prisoners of the opposite gender will notify the 911 Center of their destination, and starting and ending mileage. They will proceed without delay on the most direct route, and will notify the 911 center of any delays encountered.

*Id.* at ¶ 37. The search procedure provides that

> [s]earching a female prisoner shall be accomplished by an on-duty female police officer, or other qualified female person when possible. If there is not a qualified female available the shift commander will be notified to make arrangements to provide one. The prisoner will remain secured and under constant supervision until a female officer can complete the search. . . . .

> A search incident to arrest should generally be conducted by an officer of the same gender. If an officer of the same gender is not present, notify the Shift Commander in order to make arrangements to provide one. The prisoner will remain secured under constant supervision until an officer of the same gender can complete the search.

*Id.* Finally, the policy for supervision provides that

> [s]upervision of female prisoners shall be accomplished by a female jailer and a female prisoner shall not be placed in or removed from a detention area unless the female jailer is present. The female jailer shall retain the key for the detention area unless the female jailer is present. The female jailer shall retain the key for the detention area for females and no male person shall be permitted to enter an area where female prisoners are detained unless accompanied by the female jailer.

*Id.* at ¶ 38.

The new Search and Jail Policies changed Plaintiff's duty requirements because IPD had an overwhelmingly male staff but dealt with an above average number of females in custody. *See*

*id.* at ¶ 43.  As a result, Plaintiff was required to transport, supervise, and monitor female prisoners more frequently than male officers.  *See id.* at ¶ 40.  According to the complaint, these interactions placed Plaintiff into compromising situations where she was often forced to physically interact with female prisoners.  *See id.* at ¶ 44.

In March 2011, Plaintiff was assigned to supervise a female prisoner as she was the only available female officer.  *See id.* at ¶ 46.  The prisoner harassed Plaintiff, saying that Plaintiff's searches were sexually motivated.  *See id.*  The prisoner threatened to fabricate sexual harassment allegations, stating "[h]ey big gay woman, you want some of this? I'm gonna make it up that you did something to me."  *Id.* at ¶ 47.  After this encounter, Plaintiff voiced her concerns that the Search and Jail Policies failed to protect LGBTQ officers to her superior officers.  *See id.* at ¶ 48. In the following years, Plaintiff would regularly lodge verbal complaints about the Search and Jail Policies when fellow officers would cite them in order to compel Plaintiff into conducting supervision or searches.  *See id.* at ¶ 48.

On May 29, 2015, Plaintiff submitted a written complaint regarding the Search and Jail Policies (the "May Complaint") to Sergeant Banfield and Sergeant Nelson.  *See id.* at ¶ 49.  The May Complaint stated that the policies were discriminatory because they denied her, "an openly, and obviously, gay female," the same protections that the department afforded to male officers. *Id.*  She noted that on more than one occasion, she had been directly threatened with fabricated complaints by female prisoners.  *See id.*  Plaintiff suggested that as IDP was reworking some policies as part of an accreditation renewal process, the department should review the Search and Jail Policies to find a workable solution.  *See id.*

After she submitted the May Complaint, Plaintiff began to experience what she believes was a series of retaliatory actions in response to the complaint.  The first retaliatory action was

that her "beat" assignment changed. *See id.* at ¶ 50. The IPD allows officers to request placement on one of five primary beats. *See id.* at ¶¶ 51-52. In the forty days prior to submitting the May Complaint, Plaintiff was scheduled to her preferred beat fourteen times. *See id.* at ¶ 54. In the forty days after, Plaintiff was assigned to her preferred beat four times. *See id.*

On July 29, 2015, Plaintiff was called in to escort a female prisoner to the restroom. *See id.* at ¶ 55. When she arrived, Plaintiff discovered that a male officer had already taken the female prisoner to the restroom. *See id.* at ¶ 56. "Crews vented her frustration to Sergeant Nelson that she found the jail and search policies discriminatory because she was, from a sexual orientation standpoint, in the exact same position as the heterosexual male officers." *Id.* at ¶¶ 57, 60. She noted that she was concerned that she was "forced to have an inordinate amount of physical encounters with female prisoners." *Id.* at ¶ 59. She further expressed her concerns that the IPD had assigned her to non-preferred beats because of the written complaint. *See id.* at ¶ 58. After she finished, Sergeant Nelson accused Plaintiff of trying to avoid work by "barring herself from searching and jailing men and women," *id.* at ¶ 60, even though Plaintiff had always searched and jailed women when necessary, *see id.* at ¶ 61.

The confrontation ended with Sergeant Nelson accusing Plaintiff of insubordination. *See id.* at ¶ 63. On October 14, 2015, Plaintiff was given a notice of discipline (the "October Notice") charging her with violating the IPD's insubordination and courtesy policies as a result of this confrontation. *See id.* at ¶ 64. As a result of the October Notice, Plaintiff was forced to forfeit sixteen hours of vacation time and had a letter of reprimand placed in her permanent file. *See* Dkt. No. 15-3 at 21. The October Notice was signed by Defendant Barber. *See id.* Plaintiff believes that she was issued the October Notice because of her letter speaking out against the department's policies. *See* Dkt. No. 1 at ¶ 65.

On June 6, 2016, Sergeant Nelson called Plaintiff to the IPD's headquarters to search a female prisoner. *See id.* at ¶ 67. Upon arrival, Plaintiff saw there were multiple male officers available to search the prisoner. *See id.* at ¶ 68. Plaintiff felt that the IPD was using the Search and Jail Policies to ostracize her from her peers by highlighting her gender-nonconformity in front of her colleagues, which caused her to break down in tears. *See id.* at ¶ 69. A male lieutenant, who saw Plaintiff crying, approached her and asked her into his office without directing Plaintiff to first physically search the female prisoner. *See id.* at ¶ 70. The lieutenant informed Plaintiff that he was her superior officer for the shift and did not in any way reiterate that Plaintiff was still required to search the female prisoner. *See id.* at ¶ 71. At no point did the lieutenant tell Plaintiff that she was being insubordinate or discourteous. *See id.* at ¶ 72.

On July 27, 2016, Plaintiff was issued a second notice of discipline (the "July Notice"), alleging "that she violated IPD Rules and Regulations pertaining to insubordination and courtesy for her actions on June 6, 2016." *Id.* at ¶ 73. The July Notice also charged Plaintiff with insubordination and discourtesy over an incident that occurred on April 18, 2016. *See id.* at ¶ 76. The additional charge arose out of Plaintiff's use of the "f-word" during a discussion with a sergeant. According to the complaint, "[d]ialogue between IPD employees . . . can be course at times," *id.* at ¶ 80, and "[t]he IPD has no custom or practice of otherwise penalizing officers for using the f-word amongst themselves," *id.* at ¶ 79. Plaintiff claims that this charge is additional "evidence of the retaliation she continues to suffer." *Id.* at ¶ 81. As a result of the July Notice, Plaintiff was forced to forfeit thirty two hours of vacation time and received a permanent letter of reprimand in her personnel file. *See* Dkt. No. 15-3 at 24. The July Notice was signed by Defendant Barber. *See id.*

On June 12, 2016, Lieutenant Jeffrey Cole and Sergeant Matthew Cowen suggested that Plaintiff could propose and draft new Search and Jail Policies. *See* Dkt. No. 1 at ¶ 83. Plaintiff responded that she lacked the qualifications or training to draft new policies. *See id.* at ¶ 84. Plaintiff requested that the IPD assist her by providing her an adviser experienced in policy drafting, similar to the adviser hired to review and modify other parts of the IDP policy manual. *See id.* at ¶¶ 85-86. Plaintiff's union counsel proposed that Ithaca form a committee to create LGBTQ protective policies for the IPD. *See id.* at ¶ 87. The attorney noted that the Albany Police Department had taken this approach and were updating their policies to include LGBTQ protections. *See id.* at ¶ 88. However, Ithaca ignored this proposal. *See id.* at ¶ 89.

On August 11, 2016, Plaintiff filed a complaint for sex discrimination against Defendants with the United States Equal Employment Opportunity Commission (the "EEOC"). *See id.* at ¶ 21. On November 28, 2016, the EEOC issued a Notice of Right to Sue within ninety days of receiving the notice. *See id.* at ¶ 22. On February 23, 2017, Plaintiff filed the Complaint. The Complaint asserts eight claims against Defendants. Plaintiff alleged that Defendants discriminated against her on the basis of gender non-conformity and sexual orientation under Title VII and the NYSHRL, committed unlawful retaliation under Title VII and the NYSHRL, permitted a hostile work environment under Title VII, and violated her 14th Amendment rights.

## III. DISCUSSION

### A.    Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the

pleader's favor.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)

(citation omitted).  This presumption of truth, however, does not extend to legal conclusions.  *See*

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Although a court's review of a

motion to dismiss is generally limited to the facts presented in the pleading, the court may

consider documents that are "integral" to that pleading, even if they are neither physically

attached to, nor incorporated by reference into, the pleading.  *See Mangiafico v. Blumenthal*, 471

F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d

Cir. 2002)).

      To survive a motion to dismiss, a party need only plead "a short and plain statement of the

claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is

entitled to relief.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted).

Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief

above the speculative level," *see id.* at 555 (citation omitted), and present claims that are

"plausible on [their] face," *id.* at 570.  "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it 'stops short of the line between possibility and

plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  Ultimately, "when

the allegations in a complaint, however true, could not raise a claim of entitlement to relief,"

*Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from

conceivable to plausible, the[] complaint must be dismissed[,]" *id.* at 570.

**B.**      **Title VII and NYSHRL Claims**

As an initial matter, the Court notes that the same standard is used when analyzing Title VII and NYSHRL claims. *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citations omitted); *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (citation omitted). Discrimination claims under Title VII are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). It is the plaintiff's burden to establish a prima facie case of discrimination. *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) (citation omitted); *Lewis v. Erie Cnty. Med. Ctr. Corp.*, 907 F. Supp. 2d 336, 346 (W.D.N.Y. 2012) (citation omitted).

### 1. Discrimination

"To establish a prima facie case of gender discrimination under Title VII and the NYSHRL, a plaintiff must demonstrate: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances surrounding the employment action that give rise to an inference of discrimination." *Fahrenkrug v. Verizon Servs. Corp.*, 652 Fed. Appx. 54, 56 (2d Cir. 2016) (citing *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106-07 (2d Cir. 1989)) (internal footnote omitted); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 316 (2004) (holding that the *McDonnell Douglas* framework applies to discriminatory discharge claims brought pursuant to the NYSHRL) (citations omitted). Once established, a rebuttable presumption of discrimination arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *See Byrnie*, 243 F.3d at 102; *Lewis*, 907 F. Supp. 2d at 346.

But "a plaintiff is not required to plead a *prima facie* case under *McDonnell Douglas*, at least as the test was originally formulated, to defeat a motion to dismiss." *Vega v. Hempstead*

*Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015). Indeed, as concerns the fourth prong, "'a plaintiff need only give plausible support to a minimal inference of discriminatory motivation.'" *Id.* (quotation omitted). Nevertheless, "a discrimination complaint ... must [still] at a minimum assert nonconclusory factual matter sufficient to 'nudge[ ] [its] claims' ... 'across the line from conceivable to plausible' to proceed." *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (quotation omitted). Additionally, "'the elements of a *prima facie* case may be used as a prism to shed light upon the plausibility of the claim.'" *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 n.9 (2d Cir. 2015) (quotation omitted).

### *i. Adverse Employment Action Caused by Discrimination*

In the context of a discrimination claim, the adverse employment action requires a higher threshold than in retaliation claims, such that the plaintiff endures a "'materially adverse change' in the terms and conditions of employment." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citation omitted) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation"). In the discrimination context, the materially adverse action must relate to the terms and conditions of employment, while the "anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'" *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Burlington N.*, 548 U.S. at 67).

> "Reprimands and excessive scrutiny of an employee can contribute
> to a finding that an adverse employment action has taken place.
> However, courts in this circuit have found that reprimands, threats
> of disciplinary action and excessive scrutiny do not constitute
> adverse employment actions in the absence of other negative results
> such as a decrease in pay or being placed on probation."

10

*Imperato v. Otsego County Sheriff's Dept.*, No. 3:13-cv-1594, 2016 WL 1466545, *16 (N.D.N.Y. Apr. 14, 2016) (quoting *Uddin v. City of New York*, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) (internal quotation omitted). Thus, a complaint must allege more than just the existence of a reprimand to establish an adverse action, it must also allege facts that indicate a demonstrably adverse employment consequence. *See Weng v. Solis*, 960 F. Supp. 2d 239, 248 (D.D.C. 2013); *see also Slinkosky v. Buffalo Sewer Auth.*, No. 97-CV-0677, 2000 WL 914118, *8 (W.D.N.Y. June 29, 2000) (ruling against the plaintiff for failing "to show that the reprimand [letters] affected the compensation, promotion opportunities, or any other term, privilege, or condition of her employment"). However, recision of vacation time is a sufficient loss of benefits to establish an adverse action. *See Delgado v. Triborough Bridge and Tunnel Auth.*, 485 F. Supp. 2d 453, 464 (S.D.N.Y. 2007).

Defendants argue that Plaintiff has failed to allege any adverse actions as a result of discrimination to make a *prima facie* discrimination claim under Title VII. Defendants argue that the Search and Jail Policies are not adverse employment actions as "assignments or duties that do not 'radically' alter the nature of work are not typically adverse employment actions." *Quinby v. WestLB AG*, No. 04 CIV. 7406, 2007 WL 1153994, *11 (S.D.N.Y. Apr. 19, 2007). Defendants cite to *Westchester Cty. Corr. Benevolent Ass'n v. Cty of Westchester*, 346 F. Supp. 2d 527, 530 (S.D.N.Y 2004) to support the proposition that employers can discriminate on the basis of sex when assigning tasks to corrections officers. Second, Defendants argue that even if these policies were discriminatory, the disciplinary actions taken against Plaintiff were not because of these policies, but because Plaintiff complained about them. *See* Dkt. No. 15-4 at 21.

Defendants' reliance on the decision in *Westchester Cty. Corr. Benevolent Ass'n* is misplaced. There, the plaintiffs challenged a policy that required the temporary reassignment of

11

male correction officers to facilitate the transportation of female inmates by female correction

officers. The plaintiffs argued that changing the duties of such male officers, even temporarily,

constituted a significant alteration in the terms and conditions of their employment. *See*

*Westchester Cty.*, 346 F. Supp. 2d at 531. Rejecting this argument, the court noted that, not only

is the claimed adverse action a "mere reassignment of male officers," but the reassignments at

issue "are temporary, lasting only as long as it takes to transport female inmates." *Id.* The court

held that these temporary alterations of job responsibilities do not constitute an adverse action for

purposes of Title VII discrimination. *See id.*

Here, unlike the plaintiffs in *Westchester Cty.*, Plaintiff has alleged that the Search and Jail

Policies have resulted in her having to spend significantly more time performing custodial tasks

because of the gender disparity in the police force. Additionally, Plaintiff has alleged that the

Search and Jail Polices have required her to perform physical searches of female prisoners during

these temporary reassignments. Moreover, the case law Defendants have relied upon involved

motions for summary judgment whereas the present matter is before the Court on a motion to

dismiss.

Further, the disciplinary actions taken against Plaintiff satisfy the adverse employment

action requirement for employment discrimination. The Complaint alleges that the July Notice

was issued for Plaintiff's failure to comply with an order to search a female prisoner. If the IPD's

Search and Jail Policies are discriminatory, an official reprimand for refusing to comply with

these policies connects the reprimand to the discriminatory policy. Further, as the July Notice

resulted in a tangible harm, it can be characterized as an adverse action. Although Plaintiff

neglected to include or state any tangible harm in the Complaint, the Complaint references the

July Notice, which Defendants included as an exhibit in their motion to dismiss.[2]  The July Notice stated that Plaintiff would lose thirty-two hours of vacation time.  Given that the loss of vacation time constitutes an adverse action, this reprimand for refusing to carry out an allegedly discriminatory order is sufficient to establish an adverse employment action.

### ii. Bona Fide Occupational Qualification Defense

Although Title VII prohibits an employer from classifying employees based on their sex in a way that would adversely affect their employment, an exception exists if sex is a bona fide occupational qualification ("BFOQ") that is "reasonably necessary to the normal operation of that particular business or enterprise."  42 U.S.C. § 2000e-2(e).  Defendants argue that the discrimination claims should be dismissed because there exists a BFOQ that protects Defendants from liability.  The Court disagrees.

Defendants rely on *Buckley v. City of Syracuse*, 28 F. Supp. 2d 87 (N.D.N.Y. 1998), and *Hills v. Berkman*, 635 F. Supp. 1228 (E.D.N.Y. 1986) to support their proposition that the existence of statutory bars on male officers searching female prisoners is sufficient to establish a BFOQ as a matter of law.  *See* Dkt. No. 15-4 at 18-19.  This reliance is misplaced as neither case is applicable to the facts before the Court.

In *Buckley*, the plaintiff brought an age discrimination claim against his employer, the City of Syracuse.  *See Buckley*, 28 F. Supp. 2d at 88.  The city argued that the termination was not

---

[2] The Second Circuit "has made clear that a district court, in deciding whether to dismiss a complaint under Rule 12(b)(6), 'is generally limited to the facts as presented within the four corners of the complaint, to documents attached to the complaint, or to documents incorporated within the complaint by reference.'"  *Williams v. Time Warner Inc.*, 440 Fed. Appx. 7, 9 (2d Cir. 2011) (quoting *Taylor v. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002)).  "Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."

based on his age, but on a municipal requirement that the holder of his position reside within the city limits. *See id.* at 90. The court found that this was a legitimate reason for the termination and that the plaintiff failed to demonstrate that it was pretextual. *See id.* at 90-91. Thus, *Buckley* stands for whether an ordinance can be a legitimate reason for termination where the reliance on the ordinance was not pretextual and not whether an ordinance provides the employer a BFOQ. *Id.*

In *Hill*, the court held that federal regulations prohibiting women from serving in combat roles were regulatory barriers and distinct from stereotypical prejudice. *See Hill*, 635 F. Supp. at 1240. Regardless of whether that is true, *Hill* explicitly stated that "[i]t is clear that state legislation in conflict with Title VII is void under the supremacy clause." The only federal regulation that Defendants cite in defense of the Search and Jail Policies is the Prison Rape Elimination Act ("PREA"). *See* Dkt. No. 15-4 at 17. PREA requires that jail facilities "shall not conduct cross-gender strip searches or cross-gender visual body cavity searches." 42 U.S.C. § 15602. Given that the Search and Jail Policies go beyond the requirements of PREA, as they prohibit male officers from transferring or supervising female prisoners, it cannot be said that the statute acts as a regulatory shield for Defendants.

Defendants "bear the burden of establishing the affirmative defense that a particular qualification is a BFOQ." *Henry v. Milwaukee County*, 539 F.3d 573, 580 (7th Cir. 2008) (citing *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 92 (2008)); *White v. Dept. of Corr. Serv.*, 814 F. Supp. 2d 374, 384 (S.D.N.Y. 2011) (citing *Int'l Union v. Johnson Controls, Inc.*, 499 U.S. 187, 200 (1991)). Such an inquiry is not a simple matter of law—"[t]o justify a BFOQ defense, an employer must show a high correlation between sex and ability to perform job functions."

*White*, 814 F. Supp. 2d at 385.  Further, the defendant must be able to show that no reasonable

alternatives to the discriminatory policy existed.  *See id.*

This requires that the defendants establish that the discriminatory policy is a legitimate

need — a fact intensive inquiry that involves the defendants establishing that there are no non-

discriminatory or less discriminatory alternatives or that Defendants made a good faith attempt to

find such an alternative.  *See id.*; *Jennings v. NYS Office of Mental Health*, 786 F. Supp. 376, 381

(S.D.N.Y. 1992).  In *White*, the court looked at the procedure that the defendants used to establish

their need for a gender discriminatory policy, as well as whether it was uniformly enforced, and if

it was actually necessary.  *White*, 814 F. Supp. 2d at 844-45.  It was only after this exhaustive

search that the court could reach a conclusion about whether the defendant had asserted a

legitimate BFOQ defense.  *See id.*

Here, the validity of a BFOQ defense cannot be established on the pleadings.  Defendants

are unable to show that the policy was not discriminatory or that there was no reasonable

alternative.  Further, the problems here go deeper than the existence of the Search and Jail

Policies.  Even if the language of the Search and Jail Policies are compliant with Title VII, the

manner in which they are enforced may not be.

To reach the merits of the BFOQ defense, the Court will have to determine how the IPD

decided to adopt the Search and Jail Policies along with what, if any, alternatives existed.

Although it could eventually be clear that the Search and Jail Policies are a legitimate BFOQ, this

determination can only be made after discovery with a complete record in a motion for summary

judgment.

### iii. Discrimination Against a Protected Class

#### a. Gender Stereotype Discrimination

"Title VII does not, by its express terms, prohibit all arbitrary employment practices. Rather, it is directed only at specific impermissible bases of discrimination such as race, color, religion, sex, or national origin." *Dollinger v. State Ins. Fund*, 44 F. Supp. 2d 467, 475 (N.D.N.Y. 1999) (citations omitted).  Although it is uncommon, courts have recognized that Title VII protects against gender stereotyping by the employer.  *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (female employee denied promotion to partner in an accounting firm because of employer's negative perception of her "masculine" qualities, such as her aggressiveness and use of profanity).  Under the gender stereotyping theory of Title VII liability, "individuals who fail or refuse to comply with socially accepted gender roles are members of a protected class." *Dawson v. Bumble and Bumble*, 398 F.3d 211, 218 (2d Cir. 2005).  The gender stereotyping theory is grounded in the premise that "Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Price Waterhouse*, 490 U.S. at 251.

Defendants argue that Plaintiff has failed to allege any facts that establish discrimination based on failing to conform to gender stereotypes and that her claims of gender stereotype discrimination are intertwined with sexual orientation discrimination.  *See* Dkt. No. 15-4 at 14. The Court disagrees.

The Complaint alleges that on June 6, 2016, the reason that she, in particular, was called in to search a female prisoner was to highlight her gender non-conformity.  *See* Dkt. No. 1 at ¶¶ 67, 69.  As a result of her not performing the search, she was punished through the July Notice. *See id.* at ¶ 75.  This allegation, that she was targeted by superiors within the IPD in order to highlight her gender non-conformity and was punished for not following the order, is sufficient to plausibly allege discrimination against a protected class.

16

Therefore, for the above stated reasons, Defendants' motion to dismiss the gender stereotyping discrimination causes of action based on Title VII (Claim 1) and NYSHRL § 296 (Claim 6) is denied.

### b. Sexual Orientation Discrimination

Defendants move to dismiss Claim 2, arguing that Title VII does not protect against discrimination based on sexual orientation. Until recently, the law of the Second Circuit was that "sexual orientation is not included in the statutory protected class" under Title VII. *Kiley v. American Soc. for Prevention of Cruelty to Animals*, 296 Fed. Appx. 107, 109 (2d Cir. 2008); *see also Simonton v. Runyon*, 232 F.3d 33, 35 (2d Cir. 2000) ("The law is well-settled in this circuit . . . that [the plaintiff] has no cause of action . . . because Title VII does not prohibit harassment or discrimination because of sexual orientation"). However, on February 26, 2018, the Second Circuit sitting *en banc* abrogated *Simonton* and held that Title VII prohibits discrimination based on sexual orientation. *See Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 112 (2d Cir. 2018) ("sexual orientation discrimination is motivated, at least in part, by sex and is thus a subset of sex discrimination"). As such, Defendants' motion to dismiss Claim 2 is denied.

### 2. Retaliation

Section 704(a) of Title VII makes it unlawful for an employer to retaliate against an individual "because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 48 (2d Cir. 2012). To plead a retaliation claim, a plaintiff must allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015) (quotation omitted).

Here, Defendants have moved to dismiss the retaliation claim on the grounds that there are no adverse employment actions taken within the three-hundred-day statute of limitations prior to Plaintiff's EEOC filing with a causal connection to Plaintiff's formal complaint.

### i. Statute of Limitations

It is well-established that before filing a Title VII claim in federal court, a plaintiff needs to first exhaust all of his or her administrative remedies. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 82-83 (2d Cir. 2001) (citing 42 U.S.C. § 2000e-5(e) (2001)) (other citations omitted). In order to comply with Title VII's administrative requirements, a charge of discrimination or harassment generally must be filed with the EEOC within 180 days of the alleged unlawful employment practice or condition. *See* 42 U.S.C. § 2000e-5(e)(1). In states in which a state or local agency has overlapping authority to investigate such claims, the plaintiff's filing deadline is extended to 300 days. *See id.* Since New York has its own employment discrimination agency, a plaintiff filing discrimination or harassment charges with the EEOC must meet the 300-day filing deadline. *See Morales v. New York State Dep't of Labor*, 865 F. Supp. 2d 220, 239 (N.D.N.Y. 2012) (citing *Pikulin v. City Univ. of N.Y.*, 176 F.3d 598, 599 (2d Cir. 1999) (*per curiam*)).

Here, Plaintiff filed her EEOC complaint on August 11, 2016. The 300-day window excludes any adverse employment actions taken before October 16, 2015. As Plaintiff submitted her written complaint on May 29, 2015, the allegedly retaliatory beat assignments that occurred immediately after are time barred. Further, the October Notice, which was issued on October 14, 2015, is time barred. However, the July Notice, which was issued on July 27, 2016, is within the 300-day window and is possibly actionable under Title VII.

### ii. Causal Nexus Between the July Notice and the Protected Activity

Defendants argue that the period of time between the May Complaint and the July Notice is simply too great to support a causal connection between the protected activity and retaliation. However, this argument is flawed as it presumes that the May Complaint was the only protected activity and that the temporal proximity is the only circumstantial evidence.

"[T]he scope of actions qualifying as 'protected activity' for the purpose of Title VII retaliation is broad." *Dedjoe v. McCarthy*, No. 1:15CV117, 2017 WL 4326516, *12 (N.D.N.Y. Sept. 28, 2017) (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). Title VII's opposition clause protects "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner*, 899 F.2d at 209. "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Crawford v. Metro. Gov. of Nashville and Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009) (emphasis in original).

"The causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence . . . or directly through evidence of retaliatory animus." *Sumner*, 899 F.2d at 209. "Evidence of disparate treatment of employees who engaged in similar conduct," *id.*, and "showing that the protected activity was closely followed in time by the adverse [employment] action," *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013), are examples of circumstantial evidence that a plaintiff can use to establish a causal connection. With regards to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too

19

attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001). *Compare Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446-47 (2d Cir. 1999) (abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (discharge less than two months after plaintiff filed a sexual harassment complaint with management and ten days after filing complaint with state human rights office provided prima facie evidence of a causal connection between protected activity and retaliation); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship); *with Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (passage of three months too long to suggest a causal relationship between complaint and failure to provide good recommendation); *Vecchione v. Dep't of Educ.*, No. 10-CV-6750, 2014 WL 2116146, *5 (S.D.N.Y. May 16, 2014) (gap in time of more than six months not sufficient to establish causal link).

Here, Plaintiff alleges that her complaints about the discriminatory policy went beyond her formal complaint in writing. She also alleges that she continuously made the IPD aware of her problems with the Search and Jail Policies. Further, the July Notice was issued after events where Plaintiff expressed her displeasure about the department's search policies as applied to her. Given the Second Circuit's context focused inquiry, the Complaint sets forth sufficient temporal proximity to raise a plausible link between the July Notice and Plaintiff's protected speech.

Additionally, the Complaint states that the July Notice included punishment for using the "f-word" and that official action against an officer for using rough language is abnormal. Taking

this allegation as true, Plaintiff has alleged sufficient facts to establish disparate treatment as she received punishment for behavior that would not normally lead to a formal disciplinary notice. As disparate treatment can establish a retaliatory causal nexus, this component of the July Notice also supports Plaintiff's retaliation claim.

Given that Plaintiff has plausibly alleged disparate treatment and a temporal nexus between the protected complaints and disciplinary actions, the Court concludes that the allegations are sufficient to establish a causal connection to support Plaintiff's retaliation claim. Therefore, Defendants' motion to dismiss Plaintiff's third cause of action is denied.

### 3. Hostile Work Environment

"To state a hostile work environment claim in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) 'is objectively severe or pervasive, that is, . . . the conduct creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of'" a characteristic protected by Title VII. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)); *see also Gregory*, 243 F.3d at 692 (indicating that any characteristic protected by Title VII is sufficient to satisfy the third element).

Plaintiff has alleged that she was subjected to a hostile work environment because "Crews was gender nonconforming and gay - and because defendant had no willingness or intention to acknowledge and respect Crews's sex and/or sexual orientation." *See* Dkt. No. 1 at ¶ 118. The Complaint includes several allegations that could conceivably be used to support Plaintiff's hostile work environment claim. Most notably, the Search and Jail Policies that require her to search and supervise women. Additionally, Plaintiff alleges that she has been described as

looking like a bus driver, subjected to the "McLovin" ordeal, and that other officers have used "non-verbal cues and behaviors to exclude Crews from the peer group." Dkt. No. 1 at ¶¶ 29, 34-35. Defendants have moved to dismiss this claim arguing that the Complaint does not assert the necessary facts to establish a prima facie hostile work environment. *See* Dkt. No. 15-4 at 26.

"In order to establish a hostile work environment claim under Title VII, a plaintiff must . . . show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)). "A plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Id.* In assessing the hostility of a work environment, courts examine the "totality of the circumstances." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003). In particular, courts "consider[ ] a variety of factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Gorzynski*, 596 F.3d at 102 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

"A plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Pucino v. Verizon Wireless Commc'ns*, 618 F.3d 112, 119 (2d Cir. 2010). In order to be considered pervasive, a plaintiff must show "that the incidents were 'sufficiently continuous and concerted.'" *Brennan v. Metro. Opera Assoc.*, 192 F.3d 310, 318 (2d Cir. 1999) (quoting *Perry v. Ethan Allen, Inc.*, 115

22

F.3d 143, 149 (2d Cir. 1997)); *see also Robinson v. Purcell Const. Corp.*, 859 F. Supp. 2d 245, 255 (N.D.N.Y. 2012) (finding five "crude and offensive" gender-based comments were "neither pervasive nor severe"). As for severity, the "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are not objectively severe enough to establish a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998). On the other hand, even a single incident—if it is sufficiently severe—can create a hostile work environment if it transforms the plaintiff's workplace. *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).

Plaintiff does not contend that the Search and Jail Policies resulted in her searching more females in custody because of her sexual orientation. Instead, Plaintiff is arguing that the underlying justification for the Search and Jail Policies does not apply to her because of her sexual orientation. In essence, Plaintiff's problem is that the Search and Jail Policies are blind to her sexual orientation. Thus, Plaintiff is arguing that IPD created an objectively hostile work environment by *not* treating her differently on the basis of her sexual orientation.

The Complaint fails to set forth a plausible claim that IPD's implementation of the Search and Jail Policies contributed to an environment "permeated with discriminatory intimidation, ridicule, and insult." *Gorzynski*, 596 F.3d at 102. While it is possible that the Search and Jail Policies may have been implemented by IPD in a hostile manner, the Complaint has made no specific allegations to support this conclusion. The Complaint alleges that Plaintiff repeatedly argued with her superiors about these policies and was disciplined as a result. However, these conflicts do not demonstrate hostility towards Plaintiff on the basis of sexual orientation. Instead, they show a fight between an employee and her supervisors over department policy. Thus, the

Court cannot conclude that the Search and Jail Policies contributed to a hostile work environment because the Complaint does not plausibly allege specific facts that establish hostility.

This leaves Plaintiff's allegations regarding the "McLovin" incident, the bus driver comments, and the non-verbal actions to exclude Plaintiff from her peers to support her hostile work environment claim. Given that Plaintiff has been working at the IPD for over a decade, the Court cannot conclude that this conduct alone is sufficient to establish a hostile work environment. This conduct was neither sufficiently pervasive nor severe to create a hostile work environment under Title VII. *See Salmon v. Piliant*, 965 F. Supp. 2d 302, 306 (W.D.N.Y. 2013) (finding that the use of a racial slur by a coworker combined with multiple other incidents of offensive conduct over a seven year period was not sufficient to support a hostile work environment claim); *Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 601 (7th Cir. 2014) (holding that, "while referring to colleagues with such disrespectful language is deplorable and has no place in the workforce, one utterance of the n-word has not generally been held to be severe enough to rise to the level of establishing liability") (citation omitted).

Therefore, Defendants' motion to dismiss Plaintiff's Title VII hostile work environment claim (Claim 4) is granted.

## C.    Section 1983 Claim

"Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999) (citing 42 U.S.C. § 1983).

Plaintiff's eighth cause of action, entitled "42 U.S.C. § 1983, Fourteenth Amendment, Denial of Due Process," alleges that "Plaintiff has a right, protected by the Equal Protection clause of the Fourteenth Amendment, to be free from discrimination on the basis of sex in public

employment." Dkt. No. 1 at ¶ 143. Defendants have moved to dismiss Plaintiff's § 1983 claim on the grounds that it failed to allege a Due Process violation. In response, Plaintiff has argued that she has claimed that she has a "right to be free from discrimination on the basis of sex in public employment under the Equal Protection Clause of the Fourteenth Amendment." Dkt. No. 17-1 at 25.

"A section 1983 plaintiff . . . bears the burden of establishing the violation of a federally protected constitutional or statutory right which was the result of state action, or action 'under color of law.'" *Petrosky v. N.Y. State Dep't of Motor Vehicles*, 72 F. Supp. 2d 39, 61 (N.D.N.Y. 1999) (citations omitted). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 285 (1980)). For a plaintiff to recover in a § 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v, Doyle.*, 429 U.S. 274, 286 (1977)) (other citation omitted).

The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of "life, liberty, or property." U.S. Const. Amend. XIV § 1. However, the scope of substantive due process is very limited. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). The Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cty. Dept. of Soc. Serv.*, 489 U.S. 189, 195 (1989).

Plaintiff has failed to assert any "liberties" that she has been deprived of under the color of state law. While it may be true that Plaintiff has been exposed to an increased risk of frivolous lawsuits by prisoners, those lawsuits are not being brought by state actors and are not protected by the Due Process Clause of the Fourteenth Amendment. As such, to the extent that Plaintiff was attempting to assert a Due Process cause of action, that claim is dismissed.

Although the Eighth Cause of Action is labeled as being a claim for "Denial of Due Process," the substantive language of this cause of action claims that she "has a right, protected by the Equal Protection clause of the Fourteenth Amendment, to be free from discrimination on the basis of sex in public employment." Dkt. No. 1 at ¶ 143. "An employee is denied her equal protection right to be free from gender discrimination when she is treated differently from other similarly situated employees, thus suffering 'disparate treatment because of gender.'" *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998) (quoting *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 144 (2d Cir. 1993)).

While this cause of action is certainly not the most artfully pled, it is clear that Plaintiff is attempting to assert an Equal Protection claim and the Court will construe it as such. *See Rodriguez v. Municipality of San Juan*, 659 F.3d 168, 173 (1st Cir. 2011) (holding that courts should not rely solely on the labels in a complaint, but instead must "'probe deeper and examine the substance'" to determine the claim being asserted) (quotation and other citations omitted). Defendants have failed to address the Equal Protection claim asserted in the complaint and, since an Equal Protection claim will substantially overlap with any discovery to take place as to the remaining claims, the Court declines to *sua sponte* address the merits of this claim.

**D.      Claims Against Defendant John Barber**

Defendants move to dismiss Claims 1, 3, 5, 6, and 8 against Defendant Barber. Defendants argue that Claim 1, Claim 2, and Claim 3 should be dismissed because they are based on Title VII, and Title VII does not impose individual liability. *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003). Plaintiff has not contested this argument. Therefore, the Title VII discrimination and retaliation claims against Defendant Barber are dismissed.

Defendants argue that the Complaint has failed to allege facts to sustain the NYSHRL claims against Defendant Barber. Although the Complaint only alleges that Defendant Barber "tolerated, condoned, and/or participated in" these policies, the October and July Notices were signed by him. As Defendants have neglected to proffer a reason why Defendant Barber should escape liability in light of his participation in disciplining Plaintiff, the Court cannot dismiss these claims against him.

As discussed above, Claim 8 alleges a violation of Plaintiff's Equal Protection rights. As Defendants failed to address the alleged Equal Protection violation in this motion, the Court declines to dismiss this claim as to Defendant Barber. Therefore, the motion to dismiss Defendant Barber from Claim 8 is denied.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 15) claims against Defendant Ithaca is **GRANTED** as to Claim 4 and **DENIED** as to Claim 1, Claim 2, Claim 3, Claim 5, Claim 6, Claim 7, and Claim 8; and the Court further

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 15) Defendant Barber is

**GRANTED** as to Claim 1, Claim 2, Claim 3, and Claim 4 and **DENIED** as to Claim 5, Claim 6,

Claim 7, and Claim 8; and the court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on all parties in accordance with the Local Rules.[3]

**IT IS SO ORDERED.**

Dated: March 21, 2018
        Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[3] Although the Court has denied the motion to dismiss as to most of the claims asserted, the Court has doubts as to the viability of the claims in response to a properly supported motion for summary judgment.