## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

Edward E. Kopko, Esq.
Edward E. Kopko, Lawyer, P.C.
Attorney for Sarah Crews
308 North Tioga St., Second Floor
City, New York 14850
607.269.1300; 607.269.1301 fax
ekopko@ithaca.law

| | |
|---|---|
| SARAH CREWS,<br><br>               Plaintiff,<br><br>vs.<br><br>THE CITY OF ITHACA,<br>JOHN R. BARBER, Chief of Police, and<br>PETE TYLER, Chief of Police,<br>               Defendants. | Docket No. 3:17-cv-00213-MAD-DEP<br><br>JURY TRIAL DEMANDED |

### FIRST SUPPLEMENTAL COMPLAINT

PLAINTIFF, SARAH CREWS (Crews), by her attorney, Edward E. Kopko, as and for her First Supplemental Complaint, hereby complains against the Defendants, City of Ithaca (the City), John R. Barber (Barber) and Peter Tyler (Tyler) as follows:

### SUMMARY OF ACTION

1.      Crews is a police officer employed by the City.

2.      Crews is openly gay female and identifies as gender non-conforming.

3.      Crews alleges that Crews' employer, the City of Ithaca, by the City Police Department ("IPD"), discriminated against her, based on sex, including her gender non-conformity and sexual orientation.

4.      Crews has been forced by discriminatory, hetero-normative and sexual stereotypical IPD customs and policies to transport and physically search female prisoners simply because Crews is identified as female.  These customs and policies, as identified more fully herein, are expressly sex-to-sex – e.g. women should deal with women, men should deal with men.

5.      Crews has continually expressed that these customs and policies put Crews' employment in jeopardy because female prisoners recognize that Crews is openly gay and gender-conforming and, on multiple occasions, have threatened to make false sexual abuse allegations against Crews.

6.      Worse yet, Crews has expressed that she is forced, unlike her male peers, into an excessive amount of physical encounters with women simply because of these discriminatory, stereotypical policies.

7.      Despite Crews' objections, the IPD has continued to force Crews to transport, jail, and physically search female prisoners more often than her heterosexual male peers who are also on duty.   Further, the IPD has stood behind its outdated, stereotypical, and inherently discriminatory policies when Crews, and those acting on Crews' behalf, have advocated for modern, inclusive policies that recognize lesbian, gay, bisexual, transgender and/or queer/questioning ("LGBTQ") officers and citizens.

## DEFINITIONS

8.      Gender non-conforming refers to a person who does not conform to society's expectations of gender expression based on the gender binary (either male or female) expectations of masculinity and femininity, or how a person should identify their sex.

9.      Gender refers to the collection of society's assumptions, expectations, and traditions for how a person of a particular sex is supposed to act and/or be treated by others.

10.     Sex refers to the categorization of people at birth into "male," "female," or "intersex" categories based upon physical characteristics such as anatomy, chromosomes, and hormones.

11.     Sexual orientation refers to an individual's physical, romantic and/or emotional attraction to members of the same and/or opposite sex.

12.     Heterosexual refers to people whose enduring physical, romantic, and/or emotional attraction is to people of the opposite sex.

13.     Gay and/or homosexual refers to people whose enduring physical, romantic, and/or emotional attractions are to people of the same sex.

14.     Hetero-normative is the concept that people fall into distinct gender categories (man and woman). It presupposes that heterosexuality is the only sexual orientation or only norm, and assumes that sexual and marital contact only occurs and/or is only fitting between people of opposite sexes.

## PARTIES AND JURISDICTION

15.     At all times relevant hereto, Crews was a resident of the State of New York.

16.     At all times pertinent herein, the City was and is a municipal corporation duly organized and existing under the laws of the State of New York with its principal offices located in City Hall, City of Ithaca, State of New York.

17.     At all times pertinent herein, the defendant City operated and oversaw IPD, a law enforcement department of the City.

18.     Upon information and belief, at all times pertinent, IPD Police Chief, John R. Barber (Barber), is and was a resident of Tompkins County, State of New York, and was an employee of the City, with principal offices located at 120 E Clinton Street, Ithaca, New York 14851.

19.     Barber is sued in his individual capacity, and official capacity, as a policy-maker of the City, an enforcer of the discriminatory policies, as a person who was directly responsible for the discriminatory conduct stated in this complaint, and as a person who aided and abetted the doing of the acts forbidden under New York Executive Law § 296.

20.     Upon information and belief, at all times pertinent, IPD Police Chief, Pete Tyler (Tyler), is and was a resident of Tompkins County, State of New York, and was an employee of the City, with principal offices located at 120 E Clinton Street,

Ithaca, New York.

21.    Tyler is sued in his individual capacity, and official capacity, as a policy-maker of the City, an enforcer of the discriminatory policies, as a person who was directly responsible for the discriminatory conduct stated in this complaint, and as a person who aided and abetted the doing of the acts forbidden under New York Executive Law § 296.

22.    The City, wherein the events or omissions giving rise to the claims occurred, is within the jurisdiction of the United States District Court, Northern District of New York.  Accordingly, venue is proper under 28 USC § 1391(b)(2) and related provisions.

23.    On or about August 11, 2016, Crews properly filed a complaint for sex discrimination against defendants with the U.S. Equal Employment Opportunity Commission (Buffalo, New York office).

24.    On November 28, 2016, the EEOC issued a Notice of Right to Sue. Pursuant to this notice, and within 90 days of receiving the same notice, Crews was permitted to file this lawsuit.

25.    On February 23, 2017, within 90 days of the EEOC's issuance of the right to sue letter, Crews filed a Complaint (Dkt. 1) in the United States District Court for the Northern District Court, alleging eight cause of action, including one, sex discrimination under Title VII (gender nonconformity): two, sex discrimination under Title VII (sexual orientation); three, retaliation under Title VII; four, hostile work environment; five, sex discrimination in violation of NYHRL § 296; six, sexual orientation discrimination in violation of NYHRL § 296; seven, retaliation in violation of NYHRL § 296; and eight, 42 U.S.C. § 1983, Fourteenth Amendment denial of due process.

26.    On June 22, 2017 Defendants filed a motion to dismiss (Dkt. 15), which Crews opposed.

27.    On March 21, 2018 the United States District Court for the Northern District of New York, the Honorable Mae A. D'Agostino, United States District Judge, Presiding, issued a Memorandum-Decision and Order (Dkt. 22) which denied in part and granted in part Defendants' motion to dismiss.

28.    In particular, the District Court granted Defendant City's motion to dismiss Crews' Fourth Cause of Action for hostile work environment, and denied the City's motion to dismiss Crews' First Cause of Action for sex discrimination under Title VII (gender nonconformity), Second Cause of Action for sex discrimination under Title VII (sexual orientation), Third Cause of Action for retaliation under Title VII, Fifth Cause of Action for sex discrimination in violation of NYHRL § 296, Sixth Cause of Action sexual orientation discrimination in violation of NYHRL § 296, Seventh Cause of Action for retaliation in violation of NYHRL § 296, and Eighth Cause of Action for 42 USC § 1983 Fourteenth Amendment denial of due process.

29.    The District Court also granted Defendant Barber's motion to dismiss Crews' First Cause of Action for sex discrimination under Title VII (gender nonconformity), Second Cause of Action for sex discrimination under Title VII (sexual orientation), Third Cause of Action for retaliation under Title VII and Fourth Cause of Action for hostile work environment, and denied Defendant Barber's motion to dismiss Crews' Fifth Cause of Action for sex discrimination in violation of NYHRL § 296, Sixth Cause of Action for sexual orientation discrimination in violation of NYHRL § 296, Seventh Cause of Action for retaliation in violation of NYHRL § 296, and Eighth Causes of Action for 42 USC § 1983 Fourteenth Amendment denial of due process.

30.    On or about February 23, 2019 Crews properly filed a second charge with the EEOC alleging sexual orientation and gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended (42

U.S.C. Sex. 2000e et seq.), and Article 15 of the New York State Human Rights Law (NY Exec. § 296).

31.    On or about April 10, 2019 the EEOC issued a Right to Sue letter to Crews.

## FACTS

32.    Crews has been in law enforcement since 2002, and she began employment with the IPD in 2007.

33.    Crews has always been an openly gay law enforcement officer.

34.    Crews has never conformed to sex stereotypes.

35.    While some employees in the IPD have been accepting of her sexual orientation and non-conforming gender characteristics, others have insidiously bullied her for her appearance and affect.

36.    As well as the recent events that this complaint addresses, Crews has also suffered historical discrimination in her employment at the IPD.

37.    In her time at the IPD, when she was a recent hire, at least one fellow officer from the night shift posted a fake "McLovin" driver's license photo in the men's locker room.

38.    The posting had a photograph of Crews's face superimposed on the driver's license, and the "McLovin" reference was based on an "uncool" sex-obsessed male character in the movie *Superbad*.  This image was highly derogatory and offensive.

39.    Two officers were ultimately disciplined for this "McLovin" event.

40.    IPD policy requires uniformed police officers to wear a uniform, with a hat, and options include wearing a tie.  However, in actual practice and custom, the majority of police officers do not wear a tie with a uniform.

41.    Crews chooses to regularly wear a tie with the uniform.

42.    Crews' use of the tie, a traditionally male article of clothing, further exacerbates the implicit and subtle discriminatory behavior and bias of her peers

because it further triggers the gender and sexual orientation stereotypes when a female and lesbian officer wears a traditionally male article of clothing.

43.     Further, in Crews' time at the IPD, some fellow officers have referenced Crews as looking like a "bus driver" when Crews wears a police hat and full uniform.

44.     In general, and in specific reference to her uniform, IPD officers have used non-verbal cues and behaviors to exclude Crews from the peer group.

45.     Whenever Crews has brought the aforementioned concerns of discrimination to her superiors, including Barber, they have ignored her concerns, inappropriately and ineffectively disciplined the offending officers or engaged in victim-blaming of Crews.

46.     In 2011, IPD policies for searching and transporting prisoners were modified.  The transport policy includes:

- "Whenever possible, officers of the same gender as the prisoner will transport prisoners.  Officers transporting prisoners of the opposite gender will notify the 911 Center of their destination, and starting and ending mileage.  They will proceed without delay on the most direct route, and will notify the 911 Center of any delays encountered." (City Police Department, GO-3019, Re: Prisoner Transport and Security, Section III [Procedures for transporting prisoners – Transportation Procedures] eff. 3/22/11).

The search policy includes:

- "Searching of a female prisoner shall be accomplished by an on-duty female police officer, or other qualified female person when possible.  If there is not a qualified female available the shift commander will be notified to make arrangements to provide one.  The prisoner will remain secured and under constant supervision until a female officer can complete the search."  City Police Department, GO-3020, Re: City Jail Regulations, Procedures, Section III[4] [Admission Procedures]). …

- "A search incident to arrest should generally be conducted by an officer of the same gender.  If an officer of the same gender is not present, notify the Shift Commander in order to make arrangements to provide

one.  The prisoner will remain secured and under constant supervision until an officer of the same gender can complete the search."  (City Police Department, GO-3019, Re: Prisoner Transport and Security, Section III [Procedures for transporting prisoners – Vehicle and Prisoner Searches] [eff. 3/22/11).

47.     Further, the IPD also has supervision policies for the jail, to wit:

"Supervision of female prisoners shall be accomplished by a female jailer and a female prisoner shall not be placed in or removed from a detention area unless the female jailer is present.  The female jailer shall retain the key for the detention area unless the female jailer is present. The female jailer shall retain the key for the detention area for females and no male person shall be permitted to enter an area where female prisoners are detained unless accompanied by the female jailer."

48.     The aforementioned policies, as well as the policies that preceded them, concerned Crews because they relied on a hetero-normative ideology and subjected Crews to this framework, in which she did not fit because Crews is gender-nonconforming.

49.     Per the policies and the offspring of the policies, the IPD forces Crews, of non-conforming gender, to transport, search, and otherwise monitor female prisoners more frequently than male officers.

50.     As an example, IPD employees cite these policies when requesting and/or ordering Crews to take female prisoners to the restroom.

51.     As another example, IPD employees cite these policies when requesting and/or ordering Crews to physically search a female arrestee.

52.     Like many police departments, the IPD has an overwhelmingly male heterosexual staff, but the population they deal with is a more even mix of men and women.

53.     In execution, by citing and leveraging the plain language of these hetero-normative policies, IPD employees have placed Crews into an inordinate amount of compromising situations wherein Crews is forced into interactions, often physical, with female prisoners while male IPD employees avoid these interactions.

54.     In March 2011, Crews' concerns were exacerbated by an encounter she had with a female prisoner.

55.     In this March 2011 encounter, Crews was assigned to supervise the prisoner only because Crews was the only officer available who the IPD identified as female.  This prisoner harassed Crews, saying Crews' prisoner checks were sexually motivated in frequency.

56.     The prisoner also threatened to fabricate sexual harassment allegations against Crews.  At one point, the female prisoner began masturbating in Crews' presence and said, "Hey big gay woman, you want some of this? I'm gonna make it up that you did something to me."

57.     After this encounter, Crews began voicing concerns to superiors identifying that these sex-to-sex, stereotypical policies were close-minded and failed to recognize and protect LGBTQ officers and citizens.  In the following years, Crews made dozens of verbal complaints about these policies when these policies were cited by fellow employees.

58.     On May 29, 2015, Officer Crews gave her formal notice of her objection to the aforementioned policies, emailing Sergeant Banfield and Sergeant Nelson an email that stated the following:

> "Sgt Banfield
>
> I am giving you formal notice of my objection to my functioning as jailer to female prisoners, as required under GO-3020, City Jail Regulations.  Male officers are prohibited from jailing female prisoners, for reasons you claim not to know.  This regulation presumably protects male officers from allegations of improper contact (implicitly sexual contact) with female prisoners.  This policy is discriminatory because it provides protections to my heterosexual male coworkers that it fails to provide to me as an openly, and obviously, gay female.
>
> On more than one occasion I have been directly threatened by female prisoners who have told me they would fabricate claims against me.  I have tolerated this for years, and have verbally brought my concerns to supervisors.  I have been ridiculed and treated with hostility because I

expressed my concerns.  I have reached the point where I can no longer tolerate this situation.

As IPD is reworking the General Orders during the accreditation process, it would be an ideal time to review the policy and find a workable solution to this issue.  I expect that if the administration sees fit, reasonable accommodations can be made to protect my rights.

Please bear this in mind when assigning jail duties to me in the future.
Ofc Crews"

59.     In the month following this formal notice, Crews was more frequently assigned to her non-preferred beats – a beat that was at the bottom of her list of requested beats.

60.     There are five primary beats covered by the IPD – four car beats and one walking beat.

61.     IPD officers regularly request their beat preferences, and the beat preferences vary amongst the officers.

62.     In June and July of 2015, the IPD retaliated against Crews for complaining about the discriminatory, stereotypical policies by assigning her to beats she did not prefer nor request.

63.     In the forty days prior to Officer Crews' email to Sergeant Banfield, Crews was scheduled off Crews' preferred 204-beat four times; in the forty days following Crews' email, Crews was scheduled off Crews' preferred 204-beat fourteen times.

64.     On July 29, 2015 at approximately 5:30 am, Crews was on patrol and was called in to take a female prisoner to the restroom.

65.     When she arrived, Crews found that a male officer had already taken the female prisoner to the restroom.

66.     Crews vented her frustration to her Sergeant, explaining, again, that she found the jail and search policies discriminatory because she was, from a sexual orientation standpoint, in the exact same position as the heterosexual male officers.

67.    As she vented her frustration to the Sergeant, Crews was particularly distraught because the IPD had recently assigned her a string of non-preferred beats because she had complained of its hetero-normative policies.

68.    Crews expressed that, notwithstanding Crews' sexual orientation and gender-nonconformity, Crews was forced to have an inordinate amount of physical encounters with female prisoners.

69.    Sergeant Nelson then accused Crews of trying to get out of work, claiming that Crews was barring herself from searching and jailing men and women. Nelson's claim was patently false.

70.    Crews always searches and jails women when necessary and Crews has expressed no objection to searching and jailing men.  In fact, IPD policy states that females can jail male inmates, but male offices cannot jail female inmates.

71.    At no time has Crews ever been prohibited from searching a male inmate.

72.    By the end of this confrontation in July 2015, Nelson had accused Crews of insubordination.

73.    Nelson stated in a report concerning the July, 2015 confrontation that "I believe Ofc Crews attempts to and continues to use her sexual orientation as an excuse to avoid work that she does not like and attempts to intimidate staff by using threats of a lawsuit when she is given any direction or beat that she feels that she does not wish to work."

74.    This statement demonstrates the type of dismissive and belittling attitude that Crews regularly faces when expressing her concerns over policies, customs, and procedures, in this case that Crews' complaints are being interpreted not as legitimate, sincere concerns about discrimination, but are merely ploys to get out of work, an absurd conclusion considering Crews' lengthy career in law enforcement.

75. On October 14, 2015, as a result of the confrontation on July 29, 2015, Crews received a notice of discipline charging her with violation of the IPD's insubordination policy and courtesy policy.

76. IPD issued the aforementioned insubordination charge against Crews because she spoke out against its discriminatory policies.

77. Since receiving the first notice of discipline, Crews has not wavered in her open objections to the IPD's discriminatory, hetero-normative policies.

78. On June 6, 2016, shortly after 9:00 pm, Sergeant Nelson called Crews into IPD headquarters to perform a search of a female prisoner.

79. Upon arriving at headquarters, Crews saw a host of male heterosexual officers available to search the prisoner.

80. There and then, Crews realized that the IPD was using the stereotypical policies to highlight her gender-nonconformity, ostracize her from her peer group, make her uncomfortable, and discriminate against her, and Crews started crying.

81. A male lieutenant saw Crews crying, approached her, and repeatedly asked her to come to his office, never directing Crews to commence a physical search of the female prisoner.

82. Once Crews was in the lieutenant's office, the lieutenant told her that he was her superior officer for the shift and he did not reiterate, in any way, that Crews must still search a female prisoner on the premises.

83. At no point on June 6, 2016 did anyone tell Crews that she was being insubordinate or discourteous.

84. Nonetheless, on July 27, 2016, Crews was issued another notice of discipline which alleged that she violated IPD Rules and Regulations pertaining to insubordination and courtesy for her actions on June 6, 2016.

85. As indicated previously, Crews never refused to perform this search on June 6, 2016; she was simply too upset to immediately enact it when she arrived at headquarters and then she was redirected to her lieutenant's office.

86.     IPD's act of generating this notice of discipline of July 27, 2016 is evidence of the retaliation Crews has suffered, and continues to suffer, because she has spoken out against the discriminatory, hetero-normative policies.

87.     Further, this same notice of discipline from July 2016 also charged Crews with insubordination and discourtesy for a situation that occurred on April 18, 2016, more than three months prior.

88.     Upon information and belief, the IPD leveraged this additional notice against Crews as another means of retaliation.

89.     The additional charge regarded conversations Crews had with a sergeant for using the f-word.

90.     The IPD has no custom or practice of otherwise penalizing officers for using the f-word amongst themselves.

91.     Dialogue between IPD employees, as in most police departments, can be coarse at times, but that coarseness, unless it becomes extreme, is not customarily penalized by the IPD.

92.     Crews' notice of discipline for using the f-word is an anomaly, and, as such, is evidence of the retaliation she continues to suffer.

93.     During all times Crews has asked the IPD to address LGBTQ protections and/or acknowledgments in its policies, the IPD and the City have shown no substantive interest or effort to modify the discriminatory policies.

94.     On June 12, 2016, Lieutenant Jeffrey Cole and Sergeant Matthew Cowen told Crews that if she wanted new policies, she should propose and write them herself by the end of the month.

95.     Crews told them that she did not have the legal qualifications or training to propose language for modern policies.

96.     Crews asked that the IPD to obtain assistance in writing these policies from someone who was legally qualified and trained.

97.     Upon information and belief, the City of Ithaca has recently hired a consultant to update the IPD policy manual for New York State accreditation, but the City has not used this consultant in modifying the discriminatory, hetero-normative policies.

98.     Further, upon information and belief, Crews' Union attorney, proposed to the City's Legal Counsel that, as a means of resolving the discipline charges, the City create a committee (which would include Crews) to create policies that protect against the sexual orientation and gender and sex discrimination of arrestees and police officers.

99.     Attorney Grant highlighted to the City's Legal Counsel that the Albany Police Department has started taking such initiative to update their policies for LGBTQ protections, including, within their policies, definitions for gender, sexual orientation, gender identity, transgender, gender nonconforming and intersex.

100.    The City ignored Attorney Grant's proposal of adding LGBTQ protections to its policies.

101.    Upon information and belief, the City continues to ignore such LGBTQ-friendly policy updates despite having received a low ranking from the Human Rights Campaign (the largest LGBTQ civil rights organization in the United States) for LGBTQ-friendly legislation.

102.    Since the filing of her first EEOC Charge, Crews has routinely been subjected to ongoing and continuous acts discrimination and retaliation, culminating in the issuance of a Notice of Discipline filed against her by IPD on January 10, 2019.

103.    On or about June 27, 2018 Crews was ordered to perform a strip search of a female inmate, despite her protestation to this policy as discriminatory.  Crews informed her supervisor that she was upset and no longer in a condition to continue work, and requested to use six hours of sick leave for the remainder of her shift. Crews' supervisor denied her request, forcing her to use personal time and causing her to miss out of hour hours of overtime pay.

104.    On July 7, 2018 Crews was informed that IPD had two females in custody that needed to be stripped searched.  Despite IPD's knowledge that Crews objected to performing strip searches of female inmates, because, as a lesbian, she was, for all intents and purposes, in the same position as males vis-à-vis strip searches, Crews was nevertheless instructed to go IPD to conduct the strip searches. When Crews asked why the inmates needed to be strip-searched, Crews was informed that only one of the women needed to be searched.  Crews' search of the female inmate confirmed the inmate's claim she was not carrying anything, thus demonstrating the search was unnecessary.

105.    On August 10, 2018 Crews was ordered to IPD to "assist with a female" in custody.   Upon arrival, Crews was directed to accompany the female to the bathroom, which required Crews observing the female using the bathroom.  Crews has repeatedly raised her objections to such orders as discriminatory.

106.    On or about September 30, 2018 Crews was bypassed for assignment as Acting Sergeant, known as Officer in Charge ("OIC") in favor of a lower-ranking male officer.  An OIC is a position of significant responsibility; the OIC having the same responsibilities, duties, and authority of an on-duty supervisor.   While a supervisor eventually arrived to cover the shift, a junior male officer was nevertheless initially asked to perform the OIC position despite Crews' senior ranking and qualifications, qualifying her for the position of OIC.  IPD's denial of Crews' OIC assignment coincided with the written discovery deadline for this pending case that originated from Crews' original EEOC charge.  Crews' request for a written explanation regarding IPD's decision was later denied, and Crews was informed that her supervisor had told IPD staff that he was not "comfortable with [her] as OIC."

107.    On November 5 and 11, 2018 Crews was again passed over the OIC position in favor of a lower-ranking officer.  Pursuant to the IPD contract, the OIC is

assigned by seniority, and an officer may only be blocked from serving as an OIC by the Chief's determination.

108.    In addition to suffering the humiliation, disrespect, and indignity of being passed over the OIC position in favor of a lower-ranking, less experienced, male colleague, Crews also lost the higher hourly reimbursement she would have been entitled to.

109.    On November 21, 2018 Crews received a Notice of Investigatory Interview, dated November 20, 2018.  The date of this Notice coincided with a conference call between the parties' legal counsel that occurred that day regarding depositions and mediation on the pending litigation.

110.    On December 12, 2018 the depositions of Chief of Police, John Barber, and City of Ithaca Director of Human Resources, Schelley Michelle-Nunn, took place. Later that same day, Crews was assigned to an overtime beat shift, different from the one she held every shift in the year prior.

111.    On December 21, 2018 Crews was again assigned to that different beat assignment.  The supervisor who assigned Crews to these beat assignments was Sergeant Barry Banfield, who had been cited in Crews' first EEOC Charge for retaliation, and who had previously created and disseminated a cruel and offensive poster ridiculing Crews' gender non-conforming appearance.

112.    On December 24, 2018 Crews was notified without explanation that her holiday overtime assignment, scheduled for December 25, 2018 has been cancelled. Notably, no one else had their overtimes shift cancelled.  Crews lost $720 as a result of this last-minute cancellation; twenty-four (24) hours at $30.00 per hour.

113.    On January 3, 2019 Crews was notified by email that she would be issued a notice of discipline at 2:00 PM on January 10, 2019.  No further information was provided regarding the basis of the notice of discipline, which she received on January 10, 2019.

114.    The January 10, 2019 Notice of Discipline claims that on five dates (April 22, 2018,  June 27, 2019,  July 31, 2018,  August 24, 2018, and October 11, 2018), Crews violated IPD Rules and Regulations governing obedience to law and rules, insubordination, courtesy, assistance to citizens, and conduct.  Crews denies and has contested these claims, which will be determined at a currently-pending arbitration hearing.

115.    As per the Notice of Discipline, IPD seeks to penalize Crews thirty (30) days of unpaid suspension, and impose a Performance Improvement Plan, that places Crews under ever greater monitoring and scrutiny, mandates training on "anger management" and "emotional survival," and requires a monthly performance review for a period of twelve (12) months.

116.    In essence, IPD is creating a paper trail to provide the basis for terminating Crews from her position while at the same time requiring that she adhere to discriminatory policies or risk charges of insubordination.

117.    On February 15, 2019 Lieutenant Joly directed IPD dispatch to assign Crews to transport a female who had been picked up on a warrant.  Crews was the senior officer on duty and several junior officers were available for this task.  Crews asked Lieutenant Joly if she was assigned to the transport because the individual was female, which the Lieutenant confirmed.  Crews reiterated her position that this was discriminatory, but, notwithstanding, performed this task as ordered to do so.

118.    On April 3, 2019 the Tompkins County Sheriff's Department issued a new General Order 720 for dealing with transgender and gender non-conforming persons.

119.    Upon information and belief, the Tompkins County Sheriff is working on applying the same or similar protections to similarly situated employees.

120.    On April 6, 2019 at 3:09 AM, IPD Sergeant David Amaro ordered Crews to come in for the remainder of her shift, as a female prisoner was brought in who needed to be jailed because she is being charged with attempted assault on an officer.

Crews responded that the directive was discriminatory, and asked why the prisoner could not stay on the bench.  Sergeant Amaro responded that because the prisoner is being charged with an attempted assault on an officer, she needs to stay in a cell. Crews stated that she was being discriminated against; that the policies are discriminatory, and that Sergeant Amaro was discriminating against her.

121.    At the time Crews was ordered to respond to IPD to jail a female prisoner on April 6, 2019, Crews was working an overtime shift.  Had Crews not been working this overtime shift, only male officers would have been working.  A similar incident occurred on February 12, 2019 when Crews was on duty until 3:00 AM.  At that time, a female prisoner was in custody.  A junior male officer was ordered to supervise the female prisoner, who was kept on a "bullring," demonstrating the order given to Crews to respond to IPD on April 6, 2019 was not actually necessary, and was done knowing it would upset, humiliate, and anger Crews, and was done as an act of further retaliation against Crews for Crews' complaints against IPD's discriminatory acts and policies.

122.    On April 6, 2019 Crews advised the City's Director of Human Resources, Schelley Michell-Nunn, of this incident, and described the debilitating level of stress such situations cause to Crews.  Crews also requested that Michell-Nunn, as Director of Human Resources, speak with Crews' supervisors, about ways to keep Crews out of such stressful situations in the future.

123.    On April 18, 2019 Crews attended an arbitration hearing discipling her for her use of body worn cameras.

124.    Later that day, on April 18, 2019, Crews signed up for an overtime shift. When Crews works the overtime shift, she is almost always assigned to beat 204. The last time Crews was not assigned to beat 204 was in December, 2018, when Crews had depositions in connection with this lawsuit. Crews was assigned to beat 207 (the Ithaca Commons), one of the lowest of Crews' preferred shifts.  Another

officer, junior to Crews, and also working overtime, was given beat 201, one of Crews' preferred beats.

125.    There is a printed list in the IPD staff office, listing officers' preferred beat assignments, and listing Crews' preferred beat assignments as 201 and 204.

126.    Changing Crews' beat assignments in such close proximity to her arbitration proceeding, is yet another act of discrimination and retaliation against Crews.

127.    On May 2, 2019 Crews received a call from IPD Sergeant Dupay ("Dupay") and was instructed to respond to a vehicle stop to search a female, where the female suspect had asked for a female officer.   Crews told Dupay to tell the suspect that the responding officer was a bull dyke, to make certain the female suspect was okay with being searched by a lesbian.   Dupay refused to do this.   When Crews arrived at the scene, she explained to Dupay that being ordered to conduct the search was discriminatory.   Crews told the suspect that she was a bull dyke, but Dupay told Crews not to get into that with the suspect.   The suspect, however, stated she would prefer Crews perform the search, even if she is a lesbian.   Accordingly, Crews proceeded with the search, but found no contraband.

128.    On May 14, 2019, at about 2:40 AM Sergeant Dupay called Crews to advise her she would be jailing a female prisoner, and that assignment would last until 8:00 AM or until the day shift took over.

129.    Earlier that day, on May 14, 2019, Crews learned that she would likely be forced to interact with female prisoners because, at or about 12:45 AM, Crews had learned of a traffic stop in which female detainees were involved, and that at least two females had been arrested.

130.    As a result of knowing about this traffic stop, and that she would likely be asked to search and supervise female prisoners, and that she would once again have to face the insidious, derogatory, disrespectful, and demeaning dynamic at her workplace, having to once again face off against her supervisors and co-workers, and

defend and justify herself, Crews experienced symptoms of anxiety, including experiencing sharp pains in her back.  As a result, since learning of the traffic stop, Crews had been considering leaving work early, but was not sure when she would go.

131.    Thus, Crews, in response to the call from Sergeant Dupay, told him that she would not be staying until 8:00 AM, and that when he called Crews, Crews was just about to call and request sick time.  After the call, Sergeant Dupay did not give Crews instructions to search or jail a female prisoner.

132.    As a result, Crews used four hours of sick time to avoid facing stressful discriminatory treatment at work.

133.    The loss of sick time is significant because sick time can be used to purchase health insurance after retirement, and, as such, its value is more than the hourly rate of time lost due to illness.

134.    After Crews spoke to Sergeant Dupay, she returned to her office at the end of her shift, and heard dispatch calling a female state trooper to IPD to assist with a female prisoner.

135.    Crews learned later that one of the female prisoners was kept on a bull ring while waiting for arraignment.

136.    IPD has failed to substantively modify its policies and procedures to appropriately reflect Crews' concerns or provide her with equal protection offered to her heterosexual male colleagues.

137.    In fact, IPD has become firmly entrenched in its antiquated policies and procedures based upon outdated constructions of gender and sexual orientation.

## FIRST CAUSE OF ACTION
## SEX DISCRIMINATION UNDER TITLE VII (GENDER NONCONFORMITY)

138.    Crews incorporates herein by reference the allegations set forth in the preceding paragraphs.

139.    Crews is gender-nonconforming and does not and cannot conform with sex stereotypes that are placed upon her sex.

140.    At all times pertinent herein, the City is an employer as that term is more fully defined in Title VII of the Civil Rights Act (42 U.S.C. § 2000e).

141.    Crews is an employee of the defendants.

142.    At all times pertinent herein, the City, Barber, and Tyler tolerated, condoned and/or participated in the previously described discriminatory actions and omissions against the Crews because Crews was gender-nonconforming and failed to fit, like many officers in the IPD, into the sex stereotypical and hetero-normative policies of the IPD.

143.    As a result of the foregoing, the City, Barber, and Tyler discriminated against Crews on the basis of Crews' sex, and, among other things, discriminated against the compensation, terms, conditions, or privileges of employment of Crews because of Crews' sex.

144.    The discrimination against Crews is continuing in nature, with the discriminatory, stereotypical, hetero-normative policies remaining active and binding in the IPD.

145.    As a result of the foregoing, the City, Barber, and Tyler engaged in unlawful practices as that term is defined in Title VII of the Civil Rights Act.

## SECOND CAUSE OF ACTION
## SEX DISCRIMINATION UNDER TITLE VII (SEXUAL ORIENTATION)

146.    Crews incorporates herein by reference the allegations set forth in the preceding paragraphs.

147.    Crews is an openly gay officer in the IPD and has always been recognized by her peers and public as the same, and she is gender-nonconforming and does not and cannot conform with sex stereotypes that are placed upon her sex.

148.    At all times pertinent herein, the City is an employer as that term is more fully defined in Title VII of the Civil Rights Act (42 U.S.C. § 2000e).

149.     Crews is an employee of the defendant.

150.     At all times pertinent herein, the City, Barber, and Tyler tolerated, condoned and/or participated in the previously described discriminatory actions and omissions against the Crews because Crews was gender-nonconforming and failed to fit, like many officers in the IPD, into the sex stereotypical and hetero-normative policies of the IPD.

151.     As a result of the foregoing, the City, Barber, and Tyler discriminated against Crews on the basis of Crews' sex, and, among other things, discriminated against the compensation, terms, conditions, or privileges of employment of Crews because of Crews' sex and sexual orientation.

152.     The discrimination against Crews is continuing in nature, with the discriminatory, stereotypical, hetero-normative policies remaining active and binding in the IPD.

153.     As a result of the foregoing, the City, Barber, and Tyler engaged in unlawful practices as that term is defined in Title VII of the Civil Rights Act.

### THIRD CAUSE OF ACTION
### RETALIATION UNDER TITLE VII

154.     Crews incorporates herein by reference the allegations set forth in the preceding paragraphs.

155.     From 2011 onward, on a continuing basis and as explained in the foregoing, Crews has complained of the City's stereotypical, hetero-normative IPD policies and identified that they subjected her to sex discrimination.

156.     Accordingly, Crews complained of unlawful employment practices and her complaints were protected under federal law.

157.     As identified in the foregoing, even prior to her filing of the EEOC charges on August 11, 2016 and February 23, 2019, defendant and its agents, including Barber, and Tyler, subjected Crews to adverse employment actions for engaging in a protected activity, including, but not limited to, changing Crews' beat

assignments, issuing notices of discipline against her for conduct that the IPD has not traditionally penalized (e.g. using the f-word in private conversations), and leveraging the stereotypical policies to force Crews into uncomfortable scenarios and highlight the concept that Crews could not cope well in the stereotypical environment that her peer group embraced.

158.    The City, Barber, and Tyler made these adverse actions against Crews, and Crews suffered from these actions, because Crews spoke out against defendants' unlawful employment actions.

159.    Based on the foregoing, the City, Barber, and Tyler committed retaliation under  42 USC § 2000e-3 and related provisions.

## FOURTH CAUSE OF ACTION -
## HOSTILE WORK ENVIRONMENT

160.    Crews incorporates herein by reference the allegations in the preceding paragraphs.

161.    Crews was an employee of defendants.

162.    Based on the foregoing actions by all defendants and its agents against Crews, a reasonable person would judge that Crews' workplace was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe and pervasive as to alter the conditions of Crews' employment.

163.    A reasonable person would find defendants' aforesaid conduct to be hostile and abusive.

164.    Crews in fact perceived such conduct as hostile and abusive.

165.    Such conduct was performed by defendants and its agents because of Crews' sex – i.e. Crews was gender nonconforming and gay – and because defendants had no willingness or intention to acknowledge and respect Crews' sex and/or sexual orientation.

166.    Accordingly, Crews was subjected to a hostile work environment under Title VII and related law.

## FIFTH CAUSE OF ACTION
## SEX DISCRIMINATION IN VIOLATION OF NYHRL § 296

167.   Crews incorporates herein by reference the allegations in the preceding paragraphs.

168.   New York State Human Rights Law (Executive Law) § 296(1)(a) makes it makes it unlawful "[f]or an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

169.   New York State Human Rights Law (Executive Law) § 296(6) makes it "…unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

170.   Crews is gender-nonconforming and does not and cannot conform with sex stereotypes that are placed upon her sex.

171.   As a result, and as shown by the foregoing, defendants' policies and conduct stemming from the same discriminated against Crews because of Crews' sex because they require Crews to comply with sex stereotypical policies within which she cannot function with her own gender-identity.

172.   At all times pertinent herein, the defendant City, via its agents and representatives, including Barber, and Tyler, acted knowingly, intentionally, recklessly and/or with wanton disregard for the rights and privileges of Crews to have equal employment and non-discriminatory treatment under the law.

173.   At all times pertinent herein, defendants Barber, and Tyler, aided and abetted the unlawful discriminatory acts by actually participating in the conduct giving rise to the claims of discrimination here, by aiding and abetting violations

committed by other employees or the City itself, and by directing the discriminatory conduct in concert with other employees and the City.

174.   By reason of the foregoing, Crews was discriminated against based on her sex.

175.   As a result of the foregoing, the defendants unlawfully discriminated against Crews and otherwise deprived her of her rights under New York State's Human Rights Law.

**SIXTH CAUSE OF ACTION**
**SEXUAL ORIENTATION DISCRIMINATION IN VIOLATION OF NYHRL § 296**

176.   Crews incorporates herein by reference the allegations set forth in the preceding paragraphs.

177.   New York State Human Rights Law (Executive Law) § 296(1)(a) makes it makes it unlawful "[f]or an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

178.   New York State Human Rights Law (Executive Law) § 296(6) makes it "…unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

179.   As a result, and as shown by the foregoing, defendant's policies and conduct stemming from the same discriminated against Crews because of Crews' sexual orientation – i.e. because Crews was an openly gay officer in the IPD.

180.   At all times pertinent herein, the defendant City, via its agents and representatives, including Barber, and Tyler, acted knowingly, intentionally,

recklessly and/or with wanton disregard for the rights and privileges of Crews to have equal employment and non-discriminatory treatment under the law.

181.   At all times pertinent herein, defendants Barber, and Tyler, aided and abetted the unlawful discriminatory acts by actually participating in the conduct giving rise to the claims of discrimination here, by aiding and abetting violations committed by other employees or the City itself, and by directing the discriminatory conduct in concert with other employees and the City.

182.   By reason of the foregoing, Crews was discriminated against based on her sexual orientation.

183.   As a result of the foregoing, the defendant unlawfully discriminated against Crews and otherwise deprived her of her rights under New York State's Human Rights Law.

**SEVENTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF NYHRL § 296**

184.   Crews incorporates herein by reference the allegations set forth in the preceding paragraphs.

185.   New York State Human Rights Law (Executive Law) § 296(1)(e) makes it makes it unlawful "[f]or any employer…. [to] discriminate against any person because he or she has opposed any practices forbidden under this article [the Human Rights law]…"

186.   New York State Human Rights Law (Executive Law) § 296(6) makes it "…unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

187.   As a result, and as shown by the foregoing, defendant retaliated and discriminated against Crews upon Crews speaking in opposition to its sex-stereotypical and hetero-normative policies.

188.    At all times pertinent herein, the defendant City, via its agents and representatives, including Barber, and Tyler, acted knowingly, intentionally, recklessly and/or with wanton disregard for the rights and privileges of Crews to have equal employment and non-discriminatory treatment under the law.

189.    At all times pertinent herein, defendants Barber, and Tyler, aided and abetted the unlawful discriminatory acts by actually participating in the conduct giving rise to the claims of discrimination here, by aiding and abetting violations committed by other employees or the City itself, and by directing the discriminatory conduct in concert with other employees and the City.

190.    By reason of the foregoing, defendants retaliated and discriminated against Crews.

191.    This retaliation was demonstrated largely by defendants issuing the afore-discussed disciplinary notices to Crews and by defendant changing Crews' beat-assignments to less preferred beats immediately after she formally addressed her opposition to, and concerns about, the sex and/or sexual orientation discrimination in the IPD.

192.    As a result of the foregoing, the defendants unlawfully discriminated against Crews and otherwise deprived her of her rights under New York State's Human Rights Law.

**EIGHTH CAUSE OF CAUSE**
**42 U.S.C. § 1983, FOURTEENTH AMENDMENT, DENIAL OF DUE PROCESS**

193.    Crews incorporates herein by reference the allegations set forth in the preceding paragraphs.

194.    42 U.S.C. § 1983 provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law.

195.    Crews has stated a claim for relief pursuant to § 1983 in connection with her sex-based claim of employment discrimination.

196.    Crews has a right, protected by the Equal Protection clause of the Fourteenth Amendment, to be free from discrimination on the basis of sex in public employment.

197.    Crews has suffered purposeful or intentional discrimination by the City and Barber and Tyler on the basis of gender.

**WHEREFORE**, on the first, second, third, fourth, fifth, sixth, seventh, and eighth causes of action, and as a result of the foregoing, Crews demands judgment against the defendants, jointly and severally:

a.  in an amount of monetary damages for past and future pain and suffering;

b.  in an amount of monetary damages for past and future loss of income;

c.  punitive damages against John Barber;

d.  punitive damages against Pete Tyler;

e.  an award of attorney fees and costs and expenses;

f.  injunctive relief against the City of Ithaca prohibiting further illegal and discriminatory conduct as described in this complaint; and,

g.  for such other and further relief which to the Court is just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to FRCP 38, Crews hereby demands a trial by jury in this action on all claims and issues triable before a jury.

Edward E. Kopko
Edward E. Kopko, Lawyer, P.C.,
Attorney for Sarah Crews
308 N. Tioga Street, Second Floor
Ithaca, New York 14850
607.269.1300; Fax 607.269.1301
ekopko@ithaca.law
Friday, June 21, 2019