**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

SARAH CREWS,

                                        **Plaintiff,**

          **vs.**                                                          **3:17-CV-213**
                                                                           **(MAD/ML)**

**THE CITY OF ITHACA; JOHN R. BARBER,**
*Chief of Police*; **PETE TYLER,** *Chief of Police*;
**and DENNIS NAYOR,**

                                        **Defendants.**

_____

**APPEARANCES:**                                  **OF COUNSEL:**

**OFFICE OF EDWARD E. KOPKO**              **EDWARD E. KOPKO, ESQ.**
308 N. Tioga Street
2nd Floor
Ithaca, New York 14850
Attorneys for Plaintiff

**ROEMER WALLENS GOLD &**                 **EARL T. REDDING, ESQ.**
**MINEAUX LLP**
13 Columbia Circle
Albany, New York 12203
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

          On February 23, 2017, Plaintiff commenced this action against Defendants the City of

Ithaca and John Barber alleging unlawful workplace discrimination under Title VII of the Civil

Rights Act of 1964 ("Title VII") and the New York State Human Rights Law ("NYSHRL"), and

constitutional violations under 42 U.S.C. § 1983. *See* Dkt. No. 1 at ¶¶ 91-144. On June 22, 2017,

Defendants filed a motion to dismiss the complaint. *See* Dkt. No. 15. Defendants' motion was

granted in part and denied in part, resulting in the dismissal of a number of Plaintiff's claims. *See* Dkt. No. 22. On June 21, 2019, Plaintiff filed a supplemental complaint with additional factual allegations. *See* Dkt. No. 54. On February 10, 2020, Plaintiff filed a second supplemental complaint. *See* Dkt. No. 72. Finally, on March 2, 2020, Plaintiff filed a third supplemental complaint. *See* Dkt. No. 78. The third supplemental complaint is the operative pleading. On June 30, 2020, Defendants filed a motion for summary judgment as to all claims.[1] *See* Dkt. No. 90. Plaintiff opposed the motion and filed a cross-motion for summary judgment.[2] *See* Dkt. Nos. 102, 107. Currently before the Court are Defendants' motion for summary judgment and Plaintiff's cross-motion for summary judgment. For the following reasons, Defendants' motion for summary judgment is granted.

## II. BACKGROUND

Plaintiff began her employment as a police officer with the Ithaca Police Department ("the Department") in 2007. *See* Dkt. No. 90-1 at ¶ 80. Throughout her employment, Plaintiff has identified herself as openly gay. *See id.* at ¶ 86. Plaintiff maintains a more masculine form of dress than her female colleagues, opting to wear a tie and eight-point hat. *See id.* at ¶¶ 87-88. Early in her employment with the Ithaca Police Department, Plaintiff was ridiculed for her manner of dress by two fellow officers. *See id.* at ¶¶ 83-84. The officers created a fake ID that included

---

[1] Plaintiff argues that Defendants' statement of material facts contains assertions of fact that are not supported by specific citations to the record pursuant to Local Rule 7.1. Dkt. No. 102 at 12. However, all of the factual assertions relied upon by the Court in reaching this decision are properly supported by a specific citation to the record.

[2] Although Plaintiff filed a notice of a cross-motion for partial summary judgment, it is unclear on what grounds – or even as to which claims – Plaintiff makes her motion. *See* Dkt. No. 107. Apart from vague assertions in her opposition memorandum, Plaintiff makes no arguments as to why summary judgment should be granted in her favor. In fact, Plaintiff's arguments in opposition to Defendants' motion are primarily that issues of fact remain, which – if true – would necessarily preclude summary judgment from being entered in her favor. *See* Dkt. No. 102.

Plaintiff's picture with the name "McLovin" printed on the ID, a reference to the movie "Superbad." *See id.* This issue was investigated and the officers responsible were disciplined. *See id.* at ¶¶ 83-85.

Plaintiff's claims stem primarily from her repeated objections to the Department's policies for searching, transporting, and supervising detainees in their custody. The policies require that "'an officer of the same gender should conduct all searches,' subject to very limited exceptions involving officer safety."[3] *See id.* at ¶ 58. The policies further require the following:

> [A] search incident to arrest should generally be conducted by an officer of the same gender. If an officer of the same gender is not present, notify the Shift Commander in order to make arrangements to provide one. The prisoner will remain secured and under constant supervision until an officer of the same gender can complete the search.
>
> [W]henever possible, officers of the same gender as the prisoner will transport prisoners. Officers transporting prisoners of the opposite gender will notify the 911 Center of their destination, and starting and ending mileage. They will proceed without delay on the most direct route, and will notify the 911 Center of any delays encountered.

*Id.* at ¶¶ 59-60. Similarly, there is a requirement that all prisoners must be constantly monitored unless they are secured in a holding cell. *See id.* at ¶ 62. With respect to searching, the policies require that "searching a female prisoner shall be accomplished by an on-duty female officer, or

---

[3] The Court notes that both New York State and Federal law require significant limitations on cross-gender searches. *See* 9 N.Y.C.R.R. § 7502.1(d) ("Searching of a female prisoner shall be accomplished by the regularly appointed police matron, or other qualified female person whose services may be available on a part-time basis"); 9 N.Y.C.R.R. § 7504.1(e) ("Supervision of female prisoners shall be accomplished by a matron, and a female prisoner shall not be placed in or removed from a detention area unless the matron is present. The matron shall retain the key for the detention area for females and no male person shall be permitted to enter an area where female prisoners are detained unless accompanied by the matron."); 28 C.F.R. § 115.15(a) ("The facility shall not conduct cross-gender strip searches or cross-gender visual body cavity searches (meaning a search of the anal or genital opening) except in exigent circumstances or when performed by medical practitioners.").

other qualified female person when possible." *See id.* at ¶ 63.  "If there is not a qualified female

available the shift commander will be notified to make arrangements to provide one.  The prisoner

will remain secured and under constant supervision until a female officer can complete the

search." *See id.* at ¶ 66.

Finally, the Department's regulations also require the following:

> Supervision of female prisoners shall be accomplished by a female
> jailer, and a female prisoner shall not be placed in or removed from
> a detention area unless the female jailer is present.  The female
> jailer shall retain the key for the detention area for females and no
> male person shall be permitted to enter an area where female
> prisoners are detained unless accompanied by the female jailer.

*Id.* at ¶ 68.

Plaintiff alleges that she began to express her concern about these policies in 2011 after a

detainee under Plaintiff's supervision threatened to make a false allegation of sexual assault

against Plaintiff.  *See id.* at ¶ 89.  In May 2015, Plaintiff emailed a sergeant with the Department

stating that she is giving "formal notice of [her] objection to [her] functioning as a jailer to female

prisoners, as is required under [the Department's policies]." *See id.* at ¶ 112.  Plaintiff claims that

the policies at issue protect male officers from allegations of improper contact with female

prisoners but do not provide the same protection to her as a homosexual female.  *See id.* at ¶ 113.

In response to Plaintiff's complaints, her supervisors attempted to make a number of

modifications to protect Plaintiff.  *See id.* at ¶¶ 118-124.  Initially, female detainees were

temporarily housed in a different area while permanent alterations were made.  *See id.* at ¶ 118.

The Department contacted the Tompkins County Corrections Department and the New York State

Department of Corrections and Community Supervision to determine how their policies address

the issues raised by Plaintiff.  *See id.*  Ultimately, cameras were installed in the female cell area to

4

ensure that officers were protected from false allegations and the bathroom procedures for female detainees were changed.[4]  *See id.* at ¶¶ 131, 136.  Notably, during this time, Plaintiff was given the opportunity to present proposed modifications to the policy, but she declined to provide any specific suggestions.  *See id.* at ¶¶ 125-27.  Following these modifications, Plaintiff continued to object to the Department's search and jail policies.  Plaintiff alleges that she experienced a series of retaliatory actions in response to her objections.

Over the next several years, Plaintiff received a number of notices of discipline which alleged that Plaintiff engaged in conduct that violated the Department's rules and regulations.  Plaintiff claims that these notices of discipline were part of a course of retaliation.  The Court describes each of these notices of discipline in great detail below.  The alleged misconduct began in 2015 and continued until Plaintiff was suspended, and ultimately issued a notice of termination, in 2019.  *See id.* at ¶¶ 147-72.  In her complaint, Plaintiff also alleges that, in retaliation for her objections, she was repeatedly assigned to a less favorable beat and was passed over for an in-charge shift and a position as the Department's LGBTQ liaison.

## III. DISCUSSION

### A.    Summary Judgment Standard

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43

---

[4] The record indicates that the changes to the bathroom procedures were as follows: "If a female defendant needs to use the bathroom and no female officer is available, male officers may allow the female defendant to use cell [number seven] while the officer waits at the threshold of door C.  There [are] adequate cameras in the booking area to protect ALL officers from accusations of 'spying/peeping' while they utilize the bathroom."  *See* Dkt. No. 90-35 at 47.

F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.    Title VII and NYSHRL Claims**

As an initial matter, the Court notes that the same standard is used when analyzing Title VII and NYSHRL claims. *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citations omitted); *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (citation omitted). Discrimination claims under Title VII are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). It is the plaintiff's burden to establish a *prima facie* case of discrimination. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citation omitted); *Lewis v. Erie Cnty. Med. Ctr. Corp.*, 907 F. Supp. 2d 336, 346 (W.D.N.Y. 2012) (citation omitted).

### *1. Individual Liability*

#### a. Title VII

In its previous Memorandum-Decision and Order on Defendants' motion to dismiss, the Court dismissed Plaintiff's Title VII claims as against Defendant Barber because Title VII does not impose individual liability. *See* Dkt. No. 22 at 27. In her Third Supplemental Complaint, Plaintiff alleges multiple claims stemming from Title VII against Defendants Barber, Tyler, and Nayor. *See* Dkt. No. 78 at 25-28. Defendants argue that these claims should be dismissed for the same reasons the Court previously dismissed the Title VII claims against Defendant Barber. *See* Dkt. No. 90-3 at 8.

As the Court has previously stated, Title VII does not impose individual liability. *See Mandell*, 316 F.3d at 377. Therefore, Defendants' motion for summary judgment is granted as to Plaintiff's sex discrimination, retaliation, and hostile work environment claims against Defendants Barber, Tyler, and Nayor.

#### b. NYSHRL § 296

"'The NYSHRL allows for individual liability under two theories: [i] if the defendant has "an ownership interest" in the employer or has "the authority to hire and fire employees," *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) (discussing N.Y. Exec. Law § 296(1)), [or] [ii] if the defendant aided and abetted the unlawful discriminatory acts of others, N.Y. Exec. Law § 296(6).'" *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 521 (S.D.N.Y. 2015) (quoting *E.E.O.C. v. Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 497, 523 (E.D.N.Y. 2014)).

Defendants do not argue that Defendants Barber, Tyler, and Nayor cannot be individually liable under the NYSHRL. *See* Dkt. No. 90-3 at 9. Rather, Defendants argue that Plaintiff cannot succeed on the merits of her claims. Accordingly, the Court will analyze Plaintiff's NYSHRL

7

claims on the merits.

### 2. Discrimination

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In *Bostock v. Clayton County*, 140 S. Ct. 1731, 1747 (2020), the Supreme Court explained that "Title VII prohibits all forms of discrimination because of sex, however they may manifest themselves or whatever other labels might attach to them." Both *Bostock* and *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 120-21 (2d Cir. 2018), make clear that discrimination on the basis of an individual's sexual orientation or gender expression is prohibited by Title VII. *See Bostock*, 140 S. Ct. at 1747.

Claims of employment discrimination brought pursuant to Title VII are analyzed under the familiar burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). "Under this framework, a plaintiff must first establish a *prima facie* case of discrimination." *Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (citation omitted). In order to plead a plausible claim of Title VII discrimination, the plaintiff must allege the following: (1) she is a member of a protected class; (2) satisfactory job performance (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination. *See Fahrenkrug v. Verizon Servs. Corp.*, 652 Fed. Appx. 54, 56 (2d Cir. 2016) (citing *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106-07 (2d Cir. 1989); *McDonnell Douglas*, 411 U.S. at 802-05).

In her Third Supplemental Complaint, Plaintiff alleges that she was discriminated against because of her gender non-conformity and her sexual orientation. *See* Dkt. No. 78 at 25-26, 28-

29.  With respect to Plaintiff's claim that she was discriminated against because of her gender non-conformity, Defendants make three arguments.  *See* Dkt. No. 90-3 at 9-12.  First, Defendants argue that Plaintiff is ordered to search, jail, and transport females as part of her job as a police officer – not in order to highlight her gender non-conformity.  *See id.*  Second, Defendants argue that the law does not require that Plaintiff be treated differently than her fellow female police officers because of her gender non-conformity.  *See id.* at 10.  Finally, Defendants argue that Plaintiff's gender discrimination claim must fail because she cannot demonstrate that her job performance was satisfactory, that she suffered an adverse employment action, or that the circumstances give rise to an inference of discrimination.  *See id.* at 11-12.

As to Plaintiff's claim that she was discriminated against on the basis of her sexual orientation, Defendants argue that it is Plaintiff – not Defendants – who seek differential treatment on the basis of sexual orientation.  *See* Dkt. No. 90-3 at 15.  Specifically, Defendants argue that the policies at issue do not treat individuals differently because of their sexual orientation; rather, all individuals are treated the same, regardless of their sexual orientation.  Alternatively, Defendants argue that the policies at issue are based on mandated state and federal regulations and that abrogation of those policies would force Defendants out of compliance with these regulations. *See* Dkt. No. 90-3 at 15.

In opposition, Plaintiff argues that there exist questions of material fact as to whether Defendants discriminated against Plaintiff on the basis of her sexual orientation and/or gender non-conformity, thereby precluding summary judgment.  *See* Dkt. No. 102 at 7.  Plaintiff argues Defendants failure to "rely upon [Plaintiff's] sexual orientation or gender nonconformance in ordering [Plaintiff] to search, jail, or transport female detainees and prisoners" constitutes discrimination.  *See id.* at 8.

### a. Satisfactory Job Performance

Defendants concede that Plaintiff is a member of a protected class.  *See* Dkt. No. 90-3 at

11.  Thus, the Court's analysis will start with Defendants' argument that Plaintiff cannot

demonstrate satisfactory job performance.  *See id.* at 11-12.

Defendants argue that Plaintiff's many employment violations are the cause of her repeated

discipline and belie Plaintiff's claims of satisfactory job performance.  *See* Dkt. No. 90-3 at 18-19.

Defendants contend that Plaintiff has been disciplined for a variety of misconduct which includes

insubordination, abandonment of her post, and directing vile language and threats to her co-

workers and members of the public.  *See id.* at 18.

Plaintiff was issued a notice of discipline dated October 14, 2015, which alleged the

following:

> At approximately 5:30AM on July 29, 2015, in response to a
> request from Officer Christopher Cady that you come in to the
> station to allow a female prisoner to use the bathroom.  In the patrol
> room, in the presence of other officers and the female prisoner, you
> spoke to other officers and Sgt. Michael Nelson in a loud and irate
> manner, saying that you should not be required to take the prisoner
> to use the bathroom.  You acknowledged this behavior in a later
> email.  You forcefully threw your trash down in the patrol room,
> and continued to yell at Sgt[.] Nelson in the Sergeant's Office such
> that those in the patrol room could hear you.

Dkt. No. 90-1 at ¶¶ 147-48.  In an email regarding the incident, Plaintiff does not deny that the

exchange happened and admits that she was "irate" and "loud" during the interaction.  *See* Dkt.

No. 90-35 at 50.  Plaintiff now claims that she admitted to some of the underlying facts, but does

not believe that she was insubordinate.  *See* Dkt. No. 104 at ¶ 150.

Subsequently, Plaintiff was issued a notice of discipline dated July 27, 2016, which

alleged the following:

> At approximately 11:00PM on April 18, 2016[,] Sgt. Ted Schwartz
> spoke to you (Officer Sarah Crews) about following up on a case
> that occurred on your beat the previous day and you had failed to
> generate a report on.  Sgt. Schwartz informed you that by not
> documenting your initial interactions with the alleged victim it
> appeared that you were not doing your job.  You responded to
> Sergeant Schwartz "I don't give a fuck what it looks like".  When
> Sergeant Schwartz asked you why you were raising your voice, you
> responded by saying "I got it".  You then informed Sergeant
> Schwartz that he was "being a tough guy" because he is a new
> Sergeant.  You continued to argue with Sgt. Schwartz before
> complying with his order to follow up on the investigation.

Dkt. No. 90-1 at ¶¶ 152-53.  In her deposition, Plaintiff admits to raising her voice, stating "I don't

give a fuck what it looks like[,]" and using words to the effect of the "tough guy" comment to

Sergeant Schwartz in the presence of another officer.  *See* Dkt. No. 90-17 at 92-95.

Plaintiff was issued a notice of discipline dated January 10, 2019.  *See* Dkt. No. 90-13.

The notice of discipline includes a number of allegations of misconduct stemming from separate

interactions with citizens and fellow police officers.  *See id.*  One allegation is that Plaintiff

forcibly and unlawfully arrested a minor in possession of alcohol and addressed the minor in a

manner inconsistent with the Department's rules and regulations, which resulted in the filing of a

notice of claim against the City by the minor.  *See id.* at 2-3.  The notice of discipline also alleges

that Plaintiff made the following statement to a fellow officer: "You can go fuck yourself."  *See

id.* at 4.  On the same day, during the course of a conversation with a supervisor, Plaintiff

repeatedly stated something to the effect of "this is bullshit" in response to a supervisor's

directions and in reference to the searching and jailing policies.  *See id.*  There were also repeated

complaints following citizen encounters in which Plaintiff was allegedly unnecessarily rude and

confrontational with citizens.  *See id.* at 5-7.  Finally, the notice of discipline included allegations

that Plaintiff failed to convey important information to dispatch and was rude to dispatch

personnel.  *See* Dkt. No. 90-13 at 6-7.

Plaintiff does not admit to the charges, but admits to many of underlying facts.  *See* Dkt. No. 104 at ¶ 159.  Specifically, Plaintiff admits to arresting the minor in possession of alcohol, using physical force and stating words to the effect of those alleged in the notice of discipline. *See* Dkt. No. 90-18 at 56-59, 63-64.  Plaintiff also admits to directing the work "fuck" at a fellow officer as alleged in the notice.[5]  *See id.* at 66-67.  Additionally, Plaintiff admits that she repeatedly used the term "bullshit" during her conversations with a supervisor as alleged in the notice of discipline.  *See id.* at 66-67, 69.  Plaintiff also admits to making the statements alleged by the disgruntled citizens, arguing only that they sound more "harsh" when taken out of context. *See id.* at 68-71.  Finally, Plaintiff admits to the underlying facts regarding her interactions with dispatch as described in the notice of discipline.  *See id.* at 76-77.

In the most recent notice of discipline, dated September 25, 2019, there are a number of allegations of misconduct including violation of traffic laws, insubordination, failure to respond when directed, and directing hostile language at fellow officers.  *See* Dkt. No. 90-5.  The notice of discipline alleges that Plaintiff passed school buses while they were stopped and had lights on and stop signs out.  *See* Dkt. No. 90-5 at 3.  When the school crossing guard advised Plaintiff not to pass the stopped school buses, Plaintiff responded "I can go wherever I want."  *See id.*  Plaintiff admits to passing the school buses while they had their signs and lights out and using words to the effect alleged in the notice of discipline.  *See* Dkt. No. 90-18 at 104-07.  The notice of discipline also alleges that on one occasion, when she was unhappy about her beat assignment, Plaintiff raised her voice at her supervisor and questioned his decision.  *See* Dkt. No. 90-5 at 4.  Plaintiff

---

[5] Notably, Plaintiff admits that she has, on multiple occasions, directed the word "fuck" at fellow officers when she feels that she is being discriminated against.  *See* Dkt. No. 90-18 at 66.

then took personal leave, stating in a text message that "shift can be short all night, not my problem." *See id.*  Plaintiff claims that she does not recall raising her voice, but admits to questioning her supervisor's decision and sending the text message as alleged. *See* Dkt. No. 90-18 at 108, 110.

On another occasion, it is alleged that while working a "quality of life detail," Plaintiff received a call from dispatch to respond to a noise complaint. *See* Dkt. No. 90-5 at 4.  Plaintiff allegedly responded to dispatch that the call was a "beat call," which resulted in a complaint from the dispatch supervisor to Plaintiff's supervisor.  *See id.*  When Plaintiff's supervisor questioned her about the incident, Plaintiff allegedly stated, among other things, "I am sick of you guys misusing the detail car and if you're going to continue I will not do the detail" and "I'm done with this fucking detail." *See id.*  Plaintiff admits to having this interaction with dispatch and her supervisor. *See* Dkt. No. 90-18 at 114-15.  On yet another occasion, it is alleged that Plaintiff, when directed to search a female detainee, said to the detainee "Do you understand that you're [sic] female officer is a bull dyke?"  *See* Dkt. No. 90-5 at 5.  Plaintiff admits to using this language during her interaction with the suspect. *See* Dkt. No. 88-89.

The notice of discipline further alleges that Plaintiff failed to respond to a call for assistance from a fellow officer despite the fact that she was in the area.  *See* Dkt. No. 90-5 at 5-6. It is alleged that Plaintiff left a potentially life threatening situation without responding to a call for assistance. *See id.* at 6.  Plaintiff admits to leaving the scene without responding to the request for assistance.  *See* Dkt. No. 90-18 at 125, 127-30.

On another occasion in which Plaintiff was again dissatisfied with her beat assignment, she told her supervisors that they are "the worst supervisors." *See* Dkt. No. 90-5 at 6.  Upon being told not to take the assignment personally and to keep up the good work, Plaintiff allegedly

stormed out of the office stating "The fuck I will, you're going to see the new meaning of the word lazy." *See id.* Plaintiff again admits to this conduct. *See* Dkt. No. 90-18 at 118-19. There are also multiple allegations that Plaintiff told fellow officers and supervisors that they were "next on [her] list" and that she was putting them on "notice." *See* Dkt. No. 90-5 at 7-8. Plaintiff admits to stating this, arguing that she was informing these officers that she was aware of their discriminatory intentions. *See* Dkt. No. 90-18 at 123, 137.

Finally, the notice of discipline alleges that upon being called to assist with the arrest of a subject, Plaintiff stuck up her middle finger at a fellow officer while repeatedly mouthing and saying "Fuck you" and "I'm going to get you" to this officer. *See* Dkt. No. 90-5 at 8. Plaintiff admits to giving this fellow officer the finger. *See* Dkt. No. 90-18 at 139-40. However, Plaintiff denies saying that she will "get him" later. *See* Dkt. No. 90-18 at 18-19.

Plaintiff does not dispute that these events happened, but rather, she argues that the many notices of discipline are an "orchestrated effort" to "build a record" against her and, ultimately, justify the termination of her employment. *See* Dkt. No. 102 at 4-5. Although Plaintiff disagrees with the propriety of discipline stemming from these incidents, it is clear that the conduct alleged did, in fact, occur. The conduct to which Plaintiff admits certainly violated the Department's rules and regulations. Therefore, Plaintiffs' conduct cuts against the argument that her job performance was satisfactory.

### b. Adverse Employment Action

"An adverse employment action is 'a materially adverse change in the terms and conditions of employment.'" *Fahrenkrug*, 652 Fed. Appx. at 56 (quoting *Sanders v. NYC Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)). "'Employment actions that [this Court has] deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of

employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a

material loss of benefits, significantly diminished material responsibilities, or other indices unique

to a particular situation.'" *Id.* (quoting *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)).

> Reprimands and excessive scrutiny of an employee can contribute to
> a finding that an adverse employment action has taken place.
> "However, courts in this circuit have found that reprimands, threats
> of disciplinary action and excessive scrutiny do not constitute
> adverse employment actions in the absence of other negative results
> such as a decrease in pay or being placed on probation."

*Imperato v. Otsego Cty. Sheriff's Dept.*, No. 3:13-cv-1594, 2016 WL 1466545, *16 (N.D.N.Y.

Apr. 14, 2016) (quoting *Uddin v. City of New York*, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006))

(internal quotation omitted).  Additionally, loss of benefits, such as the recision of vacation time,

can constitute an adverse action.  *Delgado v. Triborough Bridge & Tunnel Auth.*, 485 F. Supp. 2d

453, 464 (S.D.N.Y. 2007).

   Although Defendants argue that Plaintiff did not suffer an adverse employment action, the

Court disagrees.  The notices of discipline required Plaintiff to forfeit forty-eight hours of vacation

time.  *See* Dkt. No. 90-39 at 3; Dkt. No. 90-40 at 3.  Subsequently, she was suspended without

pay.  *See* Dkt. No. 90-13 at 7.  In the most recent notice of discipline, the penalty sought is

termination of her employment.  *See* Dkt. No. 90-5 at 9.  These penalties, although they are still

being arbitrated pursuant to Plaintiff's collective bargaining agreement, qualify as adverse actions.

*See Delgado*, 485 F. Supp. 2d at 464.

### c. Inference of Discrimination

   Plaintiff argues that Defendants' search, jail, and transport policies are based on gender

norms and, therefore, the orders given to Plaintiff arising from those polices constitute

discrimination on the basis of her sexual orientation and gender non-conformity.  *See* Dkt. No.

102 at 7.  Essentially, Plaintiff argues that by ignoring Plaintiff's gender non-conformity and

sexual orientation, Defendants discriminated against Plaintiff.  *See id.* at 8-9.  Plaintiff's desire is

that she be treated differently than her fellow officers on the basis of her sexual orientation and

gender nonconformity.  *See id.* at 9-10.

Notably, in the section of her brief addressing her discrimination claim, Plaintiff does not

address Defendants' argument that there can be no inference of discrimination.  *See id.* at 7-10.

Rather, Plaintiff repeatedly, in a conclusory fashion and without citation, argues that Defendants'

failure to treat Plaintiff differently because of her sexual orientation and gender non-conformity

constitute discrimination.  *See id.*  The Court believes this lack of argument as to the applicability

of an inference of discrimination is because there can be no inference of discrimination on this

record.  Further, there is no evidentiary support for Plaintiff's conclusory allegations that she was

ordered to comply with the policies at issue to highlight her gender non-conformity.  Thus, the

Court finds that the evidence does not give rise to an inference of discrimination.[6]  Although

Plaintiff is a member of a protected class and has suffered an adverse employment action, the

Court finds, drawing all reasonable inferences in Plaintiff's favor, that she cannot demonstrate an

inference of discrimination.  Accordingly, Defendants' motion is granted as to Plaintiff's

---

[6] Plaintiff's argument is based on the premise that the policies, which require female officers to search, jail, and transport female subjects, are based on hetero-normative ideas that males are sexually attracted to females and females are sexually attracted to males.  *See* Dkt. No. 102 at 7.  Even if that were the case – which it very well may be – that does not change the fact that what Plaintiff seeks is to be discriminated against on the basis of her sexual orientation and gender non-conformity.  Plaintiff may believe the current policies to favor her heterosexual colleagues, but the Court urges Plaintiff to consider the implications of what she seeks: a judicial ruling which not only allows, but actually requires, employers to treat their homosexual and gender non-conforming employees differently solely on the basis of their sexual orientation or gender expression.

discrimination claims under Title VII and the NYSHRL.[7]

### 2. Retaliation

Title VII prohibits employers from discriminating against an employee who "has opposed any practice made an unlawful employment practice by this subchapter" or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing[.]"  42 U.S.C. § 2000e–3(a).  Courts analyze Title VII retaliation claims according to the *McDonnell Douglas* burden-shifting framework.  *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (citation omitted).

To make out a *prima facie* case of retaliation under Title VII, a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find "'(1) that [ ] he engaged in protected participation or opposition under Title VII ..., (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.'"  *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205–06 (2d Cir. 2006) (quotation and other citations omitted).

In support of their motion, Defendants argue that Plaintiff was not subjected to retaliation, rather, that the notices of discipline upon which Plaintiff bases her claim demonstrate a history of professional misconduct.  *See* Dkt. No. 90-3 at 18.  Defendants claim that Plaintiff's multiple acts of insubordination, abandonment of her post, and foul language and threats towards fellow officers and the public are the basis of the notices of discipline.  *See id.* at 18-19.  Alternatively,

---

[7] The following claims are dismissed as against all Defendants: Claim 1 (Title VII sex discrimination - gender non-conformity), Claim 2 (Title VII sex discrimination - sexual orientation), Claim 5 (NYSHRL sex discrimination), and Claim 6 (NYSHRL sexual orientation discrimination).

Defendants argue that Plaintiff cannot demonstrate a *prima facie* case of retaliation because the notices of discipline are too attenuated and she cannot demonstrate that Defendants' reasons are pretextual. *See id.* at 10. In opposition, Plaintiff argues only that questions of material fact remain as to whether she was retaliated against because of her engagement in protected activities. *See* Dkt. No. 102 at 10. Specifically, Plaintiff argues that she suffered a broad range of adverse employment actions. *See id.* at 10-11.

The record clearly indicates that Plaintiff engaged in protected activity and that Defendants were aware of Plaintiff's activity. Plaintiff complained about Defendants' searching, jailing, and transporting policies both formally and informally on many occasions. *See* Dkt. No. 90-1 at ¶¶ 89-91, 112-39. The record also indicates that Defendants were aware of this activity. *See id.* Additionally, for the same reasons described above, the Court finds that Plaintiff suffered an adverse employment action. Specifically, Plaintiff was forced to forfeit vacation time, subjected to an unpaid suspension, and faces termination of her employment. *See* Dkt. No. 90-5 at 9; Dkt. No. 90-13 at 7; Dkt. No. 90-39 at 3; Dkt. No. 90-40 at 3. Thus, the only question remaining for this claim is whether there is a causal connection between the notices of discipline and Plaintiff's complaints about the policies at issue.

The Court previously detailed Plaintiff's extensive disciplinary history. Plaintiff has faced multiple allegations of a variety of misconduct including violating traffic laws, insubordination, failing to respond when directed, and directing hostile language at fellow officers. *See* Dkt. Nos. 90-1, 90-5, 90-13. Additionally, as the Court previously noted, Plaintiff admits to much, if not all, of the underlying conduct. Plaintiff's only argument as to this point is that Defendants pursued disciplinary action against Plaintiff in an orchestrated effort to "build a record against [Plaintiff]" and seek her termination. *See* Dkt. No. 102 at 4-5. Given Plaintiff's admissions to the conduct

underlying the notices of discipline, no reasonable jury could find that Defendants acted with a retaliatory motive when issuing the notices of employment.

Although Plaintiff may not accept the propriety of the disciplinary action, that does not absolve her of the misconduct, much of which she admits. Although an individual certainly has the right to object to treatment he or she believes to be discriminatory, those objections do not entirely insulate that individual from discipline when they repeatedly violate the rules and regulations of their employers.[8]

Apart from her conclusory allegations, Plaintiff has offered no evidence to support her theory that Defendants issued the notices of discipline to retaliate against Plaintiff for opposing Defendants' policies. *See EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 848 n.21 (S.D.N.Y. 2013) (citing *Spector v. Bd. of Trs. of Cmty. Tech Colls.*, 316 Fed. Appx. 18, 21 (2d Cir. 2009)) ("Where isolated, individual incidents of alleged retaliation are supported solely by conclusory allegations of retaliatory motives, such as here, summary judgment is appropriate in favor of the defendant"). When an individual has a disciplinary record such the one alleged here, and when that individual admits to committing the conduct underlying those allegations – as Plaintiff does – the inference of a retaliatory motive dissipates. In such circumstances, a rational trier of fact is left only with the conclusion that the discipline was pursued for a non-discriminatory purpose.

Plaintiff also suggests that Defendants denying her request to serve as the LGBTQ liaison for the Department was part of the ongoing retaliation. However, Plaintiff applied for this position while she was on disciplinary suspension. *See* Dkt. No. 90-1 at ¶¶ 163, 167-68. Plaintiff has failed to demonstrate a causal connection between her objections and the rejection of her

---

[8] Perhaps if Plaintiff had alleged that other officers engaged in similar conduct, but were not disciplined, then a retaliatory motive might be found under the doctrine of disparate treatment. However, Plaintiff makes no such allegation.

application to serve as LGBTQ liasion.  Plaintiff has presented no evidence to contest Defendants' justification that her application was denied due to an ongoing investigation into her professional misconduct.

The Court finds that, drawing all reasonable inferences in Plaintiff's favor, she cannot demonstrate a causal connection between the protected activity and the adverse employment action.  Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's retaliation claims.

### 3. Hostile Work Environment

To state a hostile work environment claim in violation of Title VII, a plaintiff must set forth facts that would tend to show that the complained of conduct: "(1) 'is objectively severe or pervasive, that is, ... the conduct creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of'" a characteristic protected by Title VII.  *Patane*, 508 F.3d at 113 (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)); *see also Gregory*, 243 F.3d at 692 (indicating that any characteristic protected by Title VII is sufficient to satisfy the third element).

"In order to establish a hostile work environment claim under Title VII, a plaintiff must ... show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)).  "A plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive."  *Id.*  In assessing the hostility of a work

20

environment, courts examine the "totality of the circumstances." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003). In particular, courts "consider[ ] a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Gorzynski*, 596 F.3d at 102 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

"A plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Pucino v. Verizon Wireless Commc'ns,* 618 F.3d 112, 119 (2d Cir. 2010) (citations omitted). In order to be considered pervasive, a plaintiff must show "that the incidents were 'sufficiently continuous and concerted.'" *Brennan v. Metropolitan Opera Ass'n, Inc*, 192 F.3d 310, 318 (2d Cir. 1999) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)); *see also Robinson v. Purcell Constr. Corp.*, 859 F. Supp. 2d 245, 255 (N.D.N.Y. 2012) (finding five "crude and offensive" gender-based comments were "neither pervasive nor severe"). As for severity, the "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are not objectively severe enough to establish a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998). On the other hand, even a single incident—if it is sufficiently severe—can create a hostile work environment if it transforms the plaintiff's workplace. *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). The incidents must be more than episodic; "[the incidents] must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* Finally, "[b]eyond demonstrating a hostile work environment, a plaintiff must show a basis for imputing the objectionable conduct to the employer." *Gorzynski*, 596 F.3d

at 103 (citation omitted).

In its previous Memorandum-Decision and Order, the Court dismissed Plaintiff's Title VII hostile work environment claim for failure to sufficiently allege that she was subject to severe or pervasive conduct. *See* Dkt. No. 22 at 21-24. However, in the operative complaint, Plaintiff continues to include a Title VII hostile work environment claim. *See* Dkt. No. 78 at 28. In their motion for summary judgment, Defendants argue that Plaintiff's hostile work environment claim should continue to be dismissed for the reasons previously described by the Court as Plaintiff has failed to allege any new comments or actions to support this claim. *See* Dkt. No. 90-3 at 22. In opposition, Plaintiff argues only that she is subject to a hostile work environment because she is repeatedly subjected to "'monitoring,' internal investigations, notices of discipline[,]" and a notice of termination. *See* Dkt. No. 102 at 11.

The Court has reviewed the operative complaint and compared its allegations with those in the initial complaint. Upon review, the Court finds that Plaintiff has not alleged any additional statements or actions by Defendants which could demonstrate that Plaintiff was subjected to a hostile work environment. The new factual allegations relate primarily to Plaintiff being ordered to conduct searches on female subjects, being passed over for promotions, being assigned to unfavorable beats, and the notices of discipline. *See* Dkt. No. 78 at ¶¶ 105-64. Apart from the allegations that the Court previously considered on the motion to dismiss, there are no allegations that Plaintiff was subjected to gender-based comments, abusive language, or physically threatening or humiliating conduct from Defendants. The conduct which the Court previously considered includes the "McLovin" incident. *See* Dkt. No. 22 at 21-22. The "McLovin" incident, although clearly inappropriate, is the sort of conduct described in *Faragher* as "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes,

and occasional teasing" and, therefore, is not objectively severe enough to establish a hostile work environment. *See Faragher*, 524 U.S. at 778. Neither is the conduct "sufficiently continuous and concerted in order to be deemed pervasive." *See Alfano*, 294 F.3d at 374. This single incident occurred very early in Plaintiff's employ with the Department, which began in 2007, and the officers responsible forfeited leave time and were required to complete harassment training. *See* Dkt. No. 111 at ¶¶ 205-13.

Indeed, Plaintiff's only argument is that her repeated discipline constitutes sufficiently severe and pervasive conduct. *See* Dkt. No. 102 at 11. As the Court has explained, Plaintiff admitted to the conduct underlying most – if not all – of the violations alleged in the notices of discipline. Thus, Defendants were investigating and acting on legitimate concerns of misconduct on the part of an employee. Such action does not create a hostile work environment. *See Choulagh v. Holder*, 528 Fed. Appx. 432, 438 (6th Cir. 2013) (finding that disciplinary actions are not severe and pervasive when the plaintiff does not put forth evidence refuting the disciplinary charges); *see also Harewood v. New York City Dep't of Educ.*, No. 18-CV-5487, 2020 U.S. Dist. LEXIS 226140*, \*47 (S.D.N.Y. Nov. 30, 2020) (collecting cases) (finding that negative performance reviews and disciplinary letters are not sufficiently severe or pervasive to give rise to a hostile work environment claim).

Accordingly, the Court, drawing all reasonable inferences in Plaintiff's favor, finds that Plaintiff cannot establish that Defendants' conduct was sufficiently severe or pervasive to create a hostile work environment under Title VII. Defendants' motion for summary judgment as to Plaintiff's Title VII hostile work environment claim is, therefore, granted.

## C.     Section 1983 Claim

"Section 1983 provides a federal cause of action against any person who, acting under

color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999) (citing 42 U.S.C. § 1983).  "A section 1983 plaintiff ... bears the burden of establishing the violation of a federally protected constitutional or statutory right which was the result of state action, or action 'under color of law.'" *Petrosky v. N.Y. State Dep't of Motor Vehicles*, 72 F. Supp. 2d 39, 61 (N.D.N.Y. 1999) (citations omitted).  Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained.  *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 285 (1980)).  For a plaintiff to recover in a § 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions.  *See id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v, Doyle*, 429 U.S. 274, 286 (1977)) (other citation omitted).

The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of "life, liberty, or property."  U.S. Const. Amend. XIV § 1.  However, the scope of substantive due process is very limited.  *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). The Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."  *DeShaney v. Winnebago Cty. Dept. of Soc. Serv.*, 489 U.S. 189, 195 (1989).

The Court previously dismissed Plaintiff's Section 1983 due process claim for failure to assert any liberties that she has been deprived of under the color of state law.  *See* Dkt. No. 22 at 26.  However, in the operative pleading, Plaintiff continues to assert the exact same claim.  *See* Dkt. No. 78 at 32.  Review of the complaint makes clear that, apart from including Defendant Tyler, Plaintiff has not made a single alteration to her allegations under this claim.  *See id.*

24

Additionally, Plaintiff's briefing does not state what liberties Plaintiff claims to have been deprived of, instead only generally claiming to have been deprived of constitutional rights.  *See* Dkt. No. 102 at 14.  Thus, Plaintiff's due process claim fails for the same reasons described in the Court's previous order.  *See* Dkt. No. 22 at 26.

Because of the language in the complaint, the Court previously construed Plaintiff's complaint to include a claim for violation of the Equal Protection clause.  *See id.*  However, the Court did not address the merits of Plaintiff's Equal Protection claim because it was not raised by the parties in the motion to dismiss.  *See id.*  The operative pleading includes identical language and, thus, the Court will continue to construe the complaint to include an Equal Protection claim.

Defendants argue that Plaintiff's Equal Protection claim should be dismissed because she has failed to demonstrate that Defendants' reasons for her treatment are pre-textual and that she was treated differently than similarly situated individuals.  *See* Dkt. No. 90-3 at 23-24.  Plaintiff makes no argument in support of her equal protection claim.  *See* Dkt. No. 102 at 12-14.  Because Plaintiff does not oppose Defendants' motion for summary judgment as to the Equal Protection claim, the Court finds that Plaintiff has abandoned this claim and grants Defendants' motion for summary judgment.  *See Feacher v. Intercontinental Hotels Group*, 563 F. Supp. 2d 389, 399 (N.D.N.Y. 2008); *see also Stokes v. City of New York*, No. 05-CV-007, 2007 WL 1300983, *14 (E.D.N.Y. May 3, 2007) (collecting cases).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submission and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 90) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's cross-motion for summary judgment (Dkt. No. 107) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: January 26, 2021
      Albany, New York

**Mae A. D'Agostino**
**U.S. District Judge**